APPEAL,CLOSED,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:20–cv–01104–PLF</u>

| | |
|---|---|
| SAMMA et al v. U.S. DEPARTMENT OF DEFENSE et al | Date Filed: 04/28/2020 |
| Assigned to: Judge Paul L. Friedman | Date Terminated: 08/25/2020 |
| Cases:  1:17–cv–00998–PLF | Jury Demand: None |
|          1:17–cv–01793–PLF | Nature of Suit: 899 Administrative |
| Cause: 05:702 Administrative Procedure Act | Procedure Act/Review or Appeal of |
| | Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

**ANGE SAMMA**                   represented by   **Brett Max Kaufman**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
(212) 549–2603
Fax: (212) 549–2654
Email: bkaufman@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
917–913–4923
Email: scarletk@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street, NW
2nd Floor
Washington, DC 20005
(202) 601–4266
Fax: (202) 457–0805
Email: artspitzer@gmail.com
*ATTORNEY TO BE NOTICED*

**Jonathan Hafetz**

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
212–284–7319
Email: jonathan.hafetz@shu.edu
*TERMINATED: 08/28/2020*

**Noor Zafar**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
469–301–5991
Email: nzafar@aclu.org
*TERMINATED: 09/16/2020*

**Plaintiff**

**ABNER BOUOMO**                    represented by    **Brett Max Kaufman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Hafetz**
(See above for address)
*TERMINATED: 08/28/2020*

**Noor Zafar**
(See above for address)
*TERMINATED: 09/16/2020*

**Plaintiff**

**AHMAD ISIAKA**                    represented by    **Brett Max Kaufman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Hafetz**
(See above for address)
*TERMINATED: 08/28/2020*

**Noor Zafar**
(See above for address)
*TERMINATED: 09/16/2020*

**Plaintiff**

**MICHAEL PEREZ**                    represented by   **Brett Max Kaufman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Hafetz**
(See above for address)
*TERMINATED: 08/28/2020*

**Noor Zafar**
(See above for address)
*TERMINATED: 09/16/2020*

**Plaintiff**

**SUMIN PARK**                       represented by   **Brett Max Kaufman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scarlet Kim**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

3

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Hafetz**
(See above for address)
*TERMINATED: 08/28/2020*

**Noor Zafar**
(See above for address)
*TERMINATED: 09/16/2020*

<u>**Plaintiff**</u>

**YU MIN LEE**                                    represented by   **Brett Max Kaufman**
*on behalf of themselves and others*                              (See above for address)
*similarly situated*                                              *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Scarlet Kim**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Arthur B. Spitzer**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Jonathan Hafetz**
                                                                  (See above for address)
                                                                  *TERMINATED: 08/28/2020*

                                                                  **Noor Zafar**
                                                                  (See above for address)
                                                                  *TERMINATED: 09/16/2020*

<u>**Plaintiff**</u>

**TIMOTIUS GUNAWAN**                              represented by   **Noor Zafar**
                                                                  (See above for address)
                                                                  *TERMINATED: 09/16/2020*

                                                                  **Scarlet Kim**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**RAFAEL LEAL MACHADO**                           represented by   **Noor Zafar**
                                                                  (See above for address)
                                                                  *TERMINATED: 09/16/2020*

4

**Scarlet Kim**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. DEPARTMENT OF DEFENSE**          represented by  **Liam Holland**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Room 11318
Washington, DC 20530
202−514−4964
Email: liam.c.holland@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan Michael Swinton**
U.S. DEPARTMENT OF JUSTICE
Civil Division − Commercial
Litigation Branch
1100 L Street NW
Washington, DC 20530
(202) 305−7667
Email: nathan.m.swinton@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK T. ESPER**          represented by  **Liam Holland**
*in his official capacity as Secretary of*          (See above for address)
*Defense*          *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan Michael Swinton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 04/28/2020 | 1 | | COMPLAINT against MARK ESPER, U.S. DEPARTMENT OF DEFENSE ( Filing fee $ 400 receipt number ADCDC−7067026) filed by YU MIN LEE, ANGE SAMMA, MICHAEL PEREZ, AHMAD ISIAKA, ABNER BOUOMO, SUMIN PARK. (Attachments: # 1 Civil Cover Sheet, # 2 Summons − U.S. Department of Defense, # 3 Summons − Mark Esper)(Hafetz, Jonathan) (Entered: 04/28/2020) |
| 04/28/2020 | 2 | | |

| | | | |
|---|---|---|---|
| | | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Hafetz, Jonathan) (Entered: 04/28/2020) |
| 04/28/2020 | 3 | | NOTICE OF RELATED CASE by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. Case related to Case No. 17–1793, 17–998. (Hafetz, Jonathan) (Entered: 04/28/2020) |
| 04/28/2020 | 4 | | MOTION for Summary Judgment by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Attachments: # 1 Declaration of Scarlet Kim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Declaration of Abner Bouomo, # 21 Exhibit A to Bouomo Declaration, # 22 Declaration of Ahmad Isiaka, # 23 Declaration of Ange Samma, # 24 Declaration of Michael Perez, # 25 Declaration of Sumin Park, # 26 Declaration of Yu Min Lee, # 27 Text of Proposed Order)(Hafetz, Jonathan) Modified on 6/1/2020 pursuant to 15 Order of the Court (zjf). (Entered: 04/28/2020) |
| 04/28/2020 | 5 | | MOTION to Certify Class *and to Appoint Class Counsel* by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Attachments: # 1 Declaration of Brett Max Kaufman, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Hafetz, Jonathan). Added MOTION to Appoint Lead Counsel on 4/30/2020 (znmw). (Entered: 04/28/2020) |
| 04/28/2020 | 6 | | NOTICE of Appearance by Brett Max Kaufman on behalf of All Plaintiffs (Kaufman, Brett) (Entered: 04/28/2020) |
| 04/28/2020 | 7 | | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 04/28/2020) |
| 04/29/2020 | | | Case assigned to Judge Ellen S. Huvelle. (zmc) (Entered: 04/29/2020) |
| 04/29/2020 | 8 | | SUMMONS (2) Issued Electronically as to MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Attachment: # 1 Notice and Consent)(zmc) (Entered: 04/29/2020) |
| 05/03/2020 | 9 | | NOTICE of Appearance by Nathan Michael Swinton on behalf of MARK ESPER, U.S. DEPARTMENT OF DEFENSE (Swinton, Nathan) (Entered: 05/03/2020) |
| 05/03/2020 | 10 | | NOTICE of Appearance by Liam Holland on behalf of All Defendants (Holland, Liam) (Entered: 05/03/2020) |
| 05/04/2020 | 11 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Scarlet Kim, Filing fee $ 100, receipt number ADCDC–7086788. Fee Status: Fee Paid. by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Attachments: # 1 Declaration of Scarlet Kim, # 2 Text of Proposed Order)(Hafetz, Jonathan) (Entered: 05/04/2020) |
| 05/04/2020 | 12 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on |

|  |  |  |  |
|---|---|---|---|
|  |  |  | 5/1/2020. Answer due for ALL FEDERAL DEFENDANTS by 6/30/2020. (Hafetz, Jonathan) (Entered: 05/04/2020) |
| 05/04/2020 | 13 |  | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Noor Zafar, Filing fee $ 100, receipt number ADCDC–7088610. Fee Status: Fee Paid. by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Attachments: # 1 Declaration of Noor Zafar, # 2 Text of Proposed Order)(Hafetz, Jonathan) (Entered: 05/04/2020) |
| 05/05/2020 |  |  | MINUTE ORDER granting 11 Motion for Leave to Appear Pro Hac Vice: Upon consideration of the motion to admit Scarlet Kim to appear in this action, pro hac vice, it is hereby ORDERED that the motion is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Ellen S. Huvelle on May 5, 2020. (AG) (Entered: 05/05/2020) |
| 05/05/2020 |  |  | MINUTE ORDER granting 13 Motion for Leave to Appear Pro Hac Vice: Upon consideration of the motion to admit Noor Zafar to appear in this action, pro hac vice, it is hereby ORDERED that the motion is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Ellen S. Huvelle on May 5, 2020. (AG) (Entered: 05/05/2020) |
| 05/05/2020 |  |  | Minute Entry for Telephone Conference proceedings held before Judge Ellen S. Huvelle on 5/5/2020. Scheduling Order forthcoming via Chambers. (Court Reporter: Lisa Griffith) (zgdf) (Entered: 05/05/2020) |
| 05/05/2020 | 14 |  | NOTICE of Appearance by Scarlet Kim on behalf of ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Kim, Scarlet) (Entered: 05/05/2020) |
| 05/05/2020 | 15 |  | ORDER setting briefing schedule. See order for details. Signed by Judge Ellen S. Huvelle on May 5, 2020. (AG) (Entered: 05/05/2020) |
| 05/05/2020 |  |  | Set/Reset Deadlines: Administrative Record Index due by 5/22/2020. Cross Motions due by 5/22/2020. Response to Cross Motions due by 5/29/2020. Reply to Cross Motions due by 6/8/2020. Responses due by 6/1/2020 Replies due by 6/8/2020. Response to Motion for Summary Judgment due by 5/22/2020. Reply to Motion for Summary Judgment due by 5/29/2020. (zgdf) (Entered: 05/06/2020) |
| 05/07/2020 | 16 |  | NOTICE of Appearance by Noor Zafar on behalf of ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Zafar, Noor) (Entered: 05/07/2020) |
| 05/18/2020 | 17 |  | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 5/14/2020., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARK ESPER served on 5/14/2020; U.S. DEPARTMENT OF DEFENSE served on 5/14/2020 (Hafetz, Jonathan) (Entered: 05/18/2020) |
| 05/22/2020 | 18 |  | NOTICE *of Filing of Certification and Index of Administrative Record* by MARK ESPER, U.S. DEPARTMENT OF DEFENSE (Attachments: # 1 Declaration, # 2 Exhibit)(Swinton, Nathan) (Entered: 05/22/2020) |

| 05/22/2020 | 19 | | Cross MOTION for Summary Judgment by MARK ESPER, U.S. DEPARTMENT OF DEFENSE (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Text of Proposed Order)(Swinton, Nathan) (Entered: 05/22/2020) |
|---|---|---|---|
| 05/22/2020 | 20 | | Memorandum in opposition to re 4 MOTION for Summary Judgment filed by MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Swinton, Nathan) Modified on 6/1/2020 (zjf). (Entered: 05/22/2020) |
| 05/29/2020 | 21 | | Memorandum in opposition to re 19 Cross MOTION for Summary Judgment filed by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. (Attachments: # 1 Declaration of Scarlet Kim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Supplemental Declaration of Ange Samma, # 10 Supplemental Declaration of Abner Bouomo, # 11 Supplemental Declaration of Michael Perez, # 12 Supplemental Declaration of Sumin Park, # 13 Supplemental Declaration of Yu Min Lee, # 14 Supplemental Declaration of Ahmad Isiaka)(Kim, Scarlet) (Entered: 05/29/2020) |
| 05/29/2020 | 22 | | REPLY to opposition to motion re 4 MOTION for Summary Judgment filed by ABNER BOUOMO, AHMAD ISIAKA, YU MIN LEE, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. (Attachments: # 1 Declaration of Scarlet Kim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Supplemental Declaration of Ange Samma, # 10 Supplemental Declaration of Abner Bouomo, # 11 Supplemental Declaration of Michael Perez, # 12 Supplemental Declaration of Sumin Park, # 13 Supplemental Declaration of Yu Min Lee, # 14 Supplemental Declaration of Ahmad Isiaka)(Kim, Scarlet) (Entered: 05/29/2020) |
| 06/01/2020 | 23 | | RESPONSE re 5 MOTION to Certify Class *and to Appoint Class Counsel* MOTION to Appoint Lead Counsel filed by MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Swinton, Nathan) (Entered: 06/01/2020) |
| 06/08/2020 | 24 | | AMENDED COMPLAINT against MARK ESPER, U.S. DEPARTMENT OF DEFENSE filed by YU MIN LEE, AHMAD ISIAKA, ABNER BOUOMO, MICHAEL PEREZ, ANGE SAMMA, SUMIN PARK, TIMOTIUS GUNAWAN, RAFAEL LEAL MACHADO.(Kim, Scarlet) (Entered: 06/08/2020) |
| 06/08/2020 | 25 | | NOTICE *of Filing of Amended Complaint* by ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA re 24 Amended Complaint (Attachments: # 1 Amended Complaint Redline)(Kim, Scarlet) (Entered: 06/08/2020) |
| 06/08/2020 | 26 | | REPLY to opposition to motion re 5 MOTION to Certify Class *and to Appoint Class Counsel* MOTION to Appoint Lead Counsel filed by ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. (Zafar, Noor) (Entered: 06/08/2020) |
| 06/08/2020 | 27 | | REPLY to opposition to motion re 19 Cross MOTION for Summary Judgment filed by MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Attachments: # 1 Declaration)(Swinton, Nathan) (Entered: 06/08/2020) |

| 06/11/2020 | 28 | | ORDER re 24 plaintiffs' Amended Complaint and 26 plaintiffs' Reply to opposition to Motion for Class Certification: Defendants are ordered to file a surreply by June 22, 2020. See order for details. Signed by Judge Ellen S. Huvelle on June 11, 2020. (AG) (Entered: 06/11/2020) |
|---|---|---|---|
| 06/11/2020 | | | Set/Reset Deadlines: Surreply due by 6/22/2020. (zgdf) (Entered: 06/12/2020) |
| 06/22/2020 | 29 | | SURREPLY to re 5 MOTION to Certify Class *and to Appoint Class Counsel* MOTION to Appoint Lead Counsel filed by MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Swinton, Nathan) (Entered: 06/22/2020) |
| 06/27/2020 | 30 | | ORDER directing parties to file supplemental briefs and tentatively setting hearing on all pending motions, to be held by videoconference, for Tuesday, July 14, 2020, at 10:30 a.m. See order for details. Signed by Judge Ellen S. Huvelle on June 27, 2020. (AG) (Entered: 06/27/2020) |
| 06/27/2020 | | | Set/Reset Hearings: Motion Hearing set for 7/14/2020 at 10:30 AM in Telephonic/VTC before Judge Ellen S. Huvelle. (zgdf) (Entered: 06/30/2020) |
| 06/30/2020 | 31 | | SUPPLEMENTAL MEMORANDUM to re 5 MOTION to Certify Class *and to Appoint Class Counsel* MOTION to Appoint Lead Counsel filed by MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Attachments: # 1 Exhibit)(Swinton, Nathan) (Entered: 06/30/2020) |
| 07/01/2020 | 32 | | NOTICE *of Filing of Amended Supplemental Brief* by MARK ESPER, U.S. DEPARTMENT OF DEFENSE re 31 Supplemental Memorandum (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit)(Swinton, Nathan) (Entered: 07/01/2020) |
| 07/02/2020 | 33 | | SUPPLEMENTAL MEMORANDUM to re 5 MOTION to Certify Class *and to Appoint Class Counsel* MOTION to Appoint Lead Counsel filed by ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. (Attachments: # 1 Exhibit 1)(Kim, Scarlet) (Entered: 07/02/2020) |
| 07/08/2020 | | | MINUTE ORDER Setting Hearing on Motions: It is hereby ORDERED that a hearing on all pending motions, to be conducted by video/teleconference, is set for 7/16/2020 at 02:30 PM before Judge Ellen S. Huvelle. The Courtroom Deputy email counsel with instructions for joining the video/teleconference. Signed by Judge Ellen S. Huvelle on July 8, 2020. (AG) (Entered: 07/08/2020) |
| 07/08/2020 | | | Set/Reset Hearings: Motion Hearing set for 7/16/2020 at 2:30 PM via videoconference before Judge Ellen S. Huvelle. (zgdf) (Entered: 07/08/2020) |
| 07/10/2020 | 34 | | SURREPLY to re 5 MOTION to Certify Class *and to Appoint Class Counsel* MOTION to Appoint Lead Counsel filed by MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Swinton, Nathan) (Entered: 07/10/2020) |
| 07/16/2020 | | | Minute Entry for Video/Telephonic Motion Hearing proceedings held on 7/16/2020 before Judge Ellen S. Huvelle as to re 4 MOTION for Summary Judgment; 5 MOTION to Certify Class and to Appoint Class Counsel and MOTION to Appoint Lead Counsel; 19 Cross MOTION for Summary Judgment. Oral argument heard and motions taken under advisement. (Court Reporter Lisa Griffith) (zgdf) (Entered: 08/03/2020) |
| 07/22/2020 | 35 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE *of Information About USCIS Policy Manual* by MARK ESPER, U.S. DEPARTMENT OF DEFENSE (Swinton, Nathan) (Entered: 07/22/2020) |
| 07/23/2020 | 36 | | SUPPLEMENTAL MEMORANDUM to re 4 MOTION for Summary Judgment filed by ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. (Attachments: # 1 Declaration of Scarlet Kim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Declaration of Timotius Gunawan)(Kim, Scarlet) (Entered: 07/23/2020) |
| 07/24/2020 | 37 | | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 7−16−2020; Page Numbers: 1–85. Date of Issuance:7−24−2020. Court Reporter/Transcriber Lisa W Griffith, Telephone number 2023543247, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 8/14/2020. Redacted Transcript Deadline set for 8/24/2020. Release of Transcript Restriction set for 10/22/2020.(Griffith, Lisa) (Entered: 07/24/2020) |
| 07/24/2020 | 38 | | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 5−5−2020; Page Numbers: 1–23. Date of Issuance:7−24−2020. Court Reporter/Transcriber Lisa W Griffith, Telephone number 2023543247, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 8/14/2020. Redacted Transcript Deadline set for 8/24/2020. Release of Transcript Restriction set for 10/22/2020.(Griffith, Lisa) |

| | | |
|---|---|---|
| | | (Entered: 07/24/2020) |
| 07/24/2020 | 39 | TRANSCRIPT OF PROCEEDINGS before Judge Ellen S. Huvelle held on 6–26–2020; Page Numbers: 1–66. Date of Issuance:7–24–2020. Court Reporter/Transcriber Lisa W Griffith, Telephone number 2023543247, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/14/2020. Redacted Transcript Deadline set for 8/24/2020. Release of Transcript Restriction set for 10/22/2020.(Griffith, Lisa) (Entered: 07/24/2020) |
| 07/24/2020 | 40 | NOTICE *Regarding Plaintiff Isiaka* by ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Zafar, Noor) (Entered: 07/24/2020) |
| 07/28/2020 | 41 | MEMORANDUM by ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. (Zafar, Noor) (Entered: 07/28/2020) |
| 07/28/2020 | 42 | SUPPLEMENTAL MEMORANDUM to re 19 Cross MOTION for Summary Judgment filed by MARK ESPER, U.S. DEPARTMENT OF DEFENSE. (Swinton, Nathan) (Entered: 07/28/2020) |
| 07/31/2020 | 43 | NOTICE *Regarding Timotius Gunawan* by ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA (Zafar, Noor) (Entered: 07/31/2020) |
| 08/04/2020 | 44 | ORDER granting in part and denying in part 5 plaintiffs' Motion to Certify Class and to Appoint Class Counsel. See order for details. Signed by Judge Ellen S. Huvelle on August 4, 2020. (AG) (Entered: 08/04/2020) |
| 08/04/2020 | 45 | MEMORANDUM OPINION accompanying 44 Order granting in part and denying in part 5 plaintiffs' motion for class certification and appointment of class counsel. Signed by Judge Ellen S. Huvelle on August 4, 2020. (AG) (Entered: 08/04/2020) |
| 08/25/2020 | 46 | MEMORANDUM OPINION accompanying Order (ECF No. 47 ) granting 4 Plaintiffs' motion for summary judgment and denying 19 Defendants' cross–motion for summary judgment. Signed by Judge Ellen S. Huvelle on August 25, 2020. (AG) (Entered: 08/25/2020) |

| 08/25/2020 | 47 | | ORDER granting 4 plaintiffs' Motion for Summary Judgment; denying 19 defendants' Motion for Summary Judgment; and ordering injunctive relief for the the class, for the reasons stated in an accompanying Memorandum Opinion (ECF No. 46 ). See order for details. Signed by Judge Ellen S. Huvelle on August 25, 2020. (AG) (Entered: 08/25/2020) |
| 08/28/2020 | 48 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. Attorney Jonathan Hafetz terminated. (Hafetz, Jonathan) (Entered: 08/28/2020) |
| 09/16/2020 | 49 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to ABNER BOUOMO, TIMOTIUS GUNAWAN, AHMAD ISIAKA, YU MIN LEE, RAFAEL LEAL MACHADO, SUMIN PARK, MICHAEL PEREZ, ANGE SAMMA. Attorney Noor Zafar terminated. (Zafar, Noor) (Entered: 09/16/2020) |
| 09/23/2020 | 50 | | Case directly reassigned to Judge Paul L. Friedman by consent as related. Judge Ellen S. Huvelle is no longer assigned to the case. (ztnr) (Entered: 09/23/2020) |
| 10/23/2020 | 51 | | NOTICE OF APPEAL TO DC CIRCUIT COURT by U.S. DEPARTMENT OF DEFENSE, MARK T. ESPER. Fee Status: No Fee Paid. Parties have been notified. (Holland, Liam) (Entered: 10/23/2020) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANGE SAMMA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:20-cv-01104 |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| DEFENSE and MARK ESPER, in his | ) |
| official capacity as Secretary of Defense, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendants, United States Department of Defense and Mark

Esper in his official capacity as Secretary of Defense, hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit from this Court's August 25, 2020 Order and Judgment,

ECF No. 47, and Memorandum Opinion, ECF No. 46.

Dated: October 23, 2020                Respectfully submitted,

                                       JEFFREY BOSSERT CLARK
                                       Acting Assistant Attorney General

                                       ANTHONY J. COPPOLINO
                                       Deputy Branch Director
                                       Federal Programs Branch

                                       */s/ Liam C. Holland*
                                       LIAM C. HOLLAND
                                       Trial Attorney
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       P.O. Box 883
                                       Washington, D.C. 20009
                                       Tel: (202) 514-4964
                                       Fax: (202) 616-8470
                                       Email: Liam.C.Holland@usdoj.gov

                                       *Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ANGE SAMMA,** *et al.***,**

        **Plaintiffs,**

        **v.**

**UNITED STATES DEPARTMENT OF**
**DEFENSE,** *et al.***,**

        **Defendants.**

**Civil Action No. 20-cv-1104 (ESH)**

---

## MEMORANDUM OPINION

The United States has a long history of allowing noncitizens to serve in its military and providing those who serve with an expedited path to citizenship. But in recent years, despite its need for noncitizen enlistees to fill its ranks, the Department of Defense ("DOD") had placed obstacles in that path to citizenship. DOD's actions have led to a significant amount of litigation, much of it before this Court. This is another such case that pits noncitizen service members against the DOD.[1]

Plaintiffs are noncitizens serving in the United States military who wish to file applications for naturalization pursuant to 8 U.S.C. § 1440, which provides an expedited path to naturalization based on military service during designated periods of hostilities. They are challenging a DOD policy adopted on October 13, 2017, that requires them to meet certain durational and type of service requirements ("Minimum Service Requirements") before they can

---

[1] This case was assigned to this Court pursuant to Local Rule 40.5 because it is related to three pending cases: *Nio v. U.S. Dep't of Homeland Security*, No. 17-cv-0998 (D.D.C.); *Kirwa v. U.S. Dep't of Defense*, No. 17-cv-1793 (D.D.C.); *Calixto v, U.S. Dep't of the Army*, No. 18cv1551 (D.D.C.).

obtain a Certification of Honorable Service (USCIS Form N-426) ("N-426 Policy"). A certified

N-426 is required by the United States Citizen and Immigration Service ("USCIS") in order to

apply for naturalization based on military service. Plaintiffs bring claims under the

Administrative Procedure Act ("APA") seeking to vacate the Minimum Service Requirements

because they are arbitrary and capricious; not in accordance with law; and in excess of statutory

jurisdiction; result in agency action unlawfully withheld and unreasonably delayed; and were

enacted without notice and comment. *See* 5 U.S.C. §§ 553, 706(1), 706(2)(A), (C), (D). The

Court has certified a class and two subclasses to challenge these requirements. *See Samma v.*

*U.S. Dep't of Defense,* No. 20-cv-1104, 2020 WL 4501000, at \*10 (D.D.C. Aug. 4, 2020).

Before the Court are the parties' cross-motions for summary judgment. (*See* Pls. Mot. for

Summ. J., ECF No. 4 ("Pls.' SJ Mot."); Defs.' Cross-Mot. for Summ. J., ECF No. 19 ("Defs.' SJ

Mot.").) For the reasons stated herein, the Court will grant plaintiffs' motion for summary

judgment and vacate the Minimum Service Requirements in DOD's N-426 Policy.

## BACKGROUND

## I.    STATUTORY FRAMEWORK

### A.    Use of Noncitizens in the United States Armed Forces

Noncitizens have served in the United States military since the founding of this country,

both voluntarily and as draftees. (*See* Pls.' Mot. for Class Cert. Ex. 2, at 3, ECF No. 5-3, also

available at https://dod.defense.gov/news/mavni-fact-sheet.pdf ("MAVNI Fact Sheet")); *see also*

Act of July 30, 1813, 13 Cong. ch. 36, 3 Stat. 53, https://www.loc.gov/law/help/statutes-at-

large/13th-congress/c13.pdf (allowing noncitizens to enlist); Selective Service Act of 1948, Pub.

L. No. 80-759, §§ 3-4, 62 Stat. 604, 605-606 (authorizing the induction of male aliens).

Although the groups of noncitizens who have been allowed to enlist has varied over the years, at

this time the groups are defined in 10 U.S.C. § 504(b), which sets out the "Uniform Citizenship

2

and Residency Requirements for Enlistment in the Armed Forces that Congress first adopted in
2006.  *See* National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163,
§ 542(a), 119 Stat. 3136.

Two parts of § 504(b) are relevant to the present litigation.  First, § 504(b)(1) provides
that: "A person may be enlisted in any armed force . . . if the person is . . . (B) An alien who is
lawfully admitted for permanent residence, as defined in section 101(a)(20) of the Immigration
and Nationality Act (8 U.S.C. 1101(a)(20))."  "The term 'lawfully admitted for permanent
residence' means the status of having been lawfully accorded the privilege of residing
permanently in the United States as an immigrant in accordance with the immigration laws, such
status not having changed."  8 U.S.C.A. § 1101(a)(20).  Approximately 7,000 lawful permanent
residents ("LPRs") enlist each year.  (*See* Administrative Record ("AR") 19.)[2]

Second, § 504(b)(2) provides that "the Secretary concerned may authorize the enlistment
of a person not described in paragraph (1) if the Secretary determines that such person possesses
a critical skill or expertise--(A) that is vital to the national interest; and (B) that the person will
use in the primary daily duties of that person as a member of the armed forces."  10 U.S.C.
§ 504(b)(2).  In 2008, the Secretary of Defense utilized his authority under § 504(b)(2) to
authorize the Military Accessions Vital to the National Interest ("MAVNI") Pilot Program.  (*See*
AR 124.)  The MAVNI Program allowed non-citizens who were not LPRs to enlist in the United
States military if it was determined that enlistment would be vital to the national interest because
they were "health care professionals" in certain specialties or possessed "critical foreign
language skills."  (AR 46 (Decl. of Stephanie Miller ¶ 4, July 7, 2017) ("7/7/17 Miller Decl.").)

---

[2] Citations to the Administrative Record ("AR") refer to the administrative record that was
prepared by the DOD for this case and provided to the Court on May 22, 2020.  An index to the
AR is docketed at ECF No. 18.

3

MAVNI enlistments stopped in 2016, for reasons discussed in greater detail *infra*, but from 2008 to 2016, more than 10,000 individuals enlisted in the military through the MAVNI program. (*See* AR 19, 46.)[3]

## B.    Statutory Eligibility for Naturalized Citizenship Based on Military Service

The service and sacrifice of noncitizens who serve in the United States military has long been recognized with grants of eligibility for citizenship. *See, e.g*., 1813 Act (allowing noncitizens to become citizens immediately upon entering military service if they declared an intent to naturalize); Act of July 17, 1862, 37 Cong. ch. 200, 12 Stat. 594 (available at https://www.loc.gov/law/help/statutes-at-large/37th-congress/session-2/c37s2ch200.pdf) (allowing noncitizens who enlisted to become citizens upon being honorably discharged). Since the enactment of the Nationality Act of 1940, however, paths to citizenship based on military service have been codified as part of our immigration laws. *See* Nationality Act of 1940, Pub. L. No. 76–853, § 324, 54 Stat. 1137, 1149–1150 (1940) ("Nationality Act").

The Nationality Act provided that a "person . . . who has served honorably at any time in the United States Army, Navy, Marine Corps or Coast Guard for a period or periods aggregating three years and who, if separated from such service, was separated under honorable conditions, may be naturalized . . ." without having to satisfy several of the otherwise applicable requirements for naturalization. *Id*. The statute further provided "[a]ny such period or periods of service under honorable conditions . . . shall be proved by duly authenticated copies of records of the executive departments having custody of the records of such service." *Id*. at 1149-50.

---

[3] The MAVNI Program is described in detail in *Nio v. U.S. Dep't of Homeland Sec.*, 270 F. Supp. 3d 49, 53-54 (D.D.C. 2017) ("*Nio I*"); *Nio v. U.S. Dep't of Homeland Sec.*, 385 F. Supp. 3d 44, 47-49 (D.D.C. 2019) ("*Nio II*"); and *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 22 (D.D.C. 2017) ("*Kirwa I*").

4

In 1942, the Nationality Act was amended to add a new title that provided that those "who ha[ve] served or hereafter serve[] honorably" in World War II and who have been lawfully admitted to the United States were eligible to naturalize without meeting the three-year service requirement. Act of Mar. 27, 1942, Pub. L. No. 77-507, § 1001, 56 Stat. 176, 182. For these applicants, service could be proved either by filing two affidavits of at least two citizen servicemembers "of the noncommissioned or warrant officer grade or higher . . . *or* by a duly authenticated copy of the record of the executive department having custody of the record of petitioner's service, showing that the petitioner is or was during the present war a member serving honorably in such armed forces." *Id*. A later amendment that same year extended this type of naturalization to those who served in World War I. *See* Act of Dec. 7, 1942, Pub. L. No. 77-791, 56 Stat. 1041-42.

In 1948, Congress extended eligibility to naturalize based on service during WWI or WWII to persons who were not LPRs at the time of enlistment if (1) at the time of enlistment or induction such person shall have been in the United States or an outlying possession (including the Panama Canal Zone, but excluding the Philippine Islands), or (2) at any time subsequent to enlistment or induction such person shall have been lawfully admitted to the United States for permanent residence." Act of June 1, 1948, Pub. L. No. 80-567, 62 Stat. 281-82. The 1948 amendment also added the following provision, which is at the heart of this case: "[t]he executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions." *Id*. Further, it altered the methods for proving honorable service, eliminating the option of using an authenticated copy of a service record and replacing it with the option of providing a "duly authenticated certification from the executive department under

which the petitioner is serving" that "states whether the petitioner has served honorably in an active-duty status during either World War I or [World War II]."[4]  *Id*. at 282.

In 1952, Congress replaced the Nationality Act with the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952), but it made no substantive changes in the law with respect to naturalization based on military service, providing one route for persons who served honorably at any time for periods aggregating three years, *see* INA § 328 (codified at 8 U.S.C. § 1439), and another route for persons who had served honorably in an active-duty status during WWI or WWII.  *See* INA § 329 (codified at 8 U.S.C. § 1440).  Section 1440 maintained the language from the Nationality Act that "[t]he executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions" and that "service in the military, air, or naval forces of the United States shall be proved by a duly authenticated certification from the executive department under which the petitioner served or is serving, which shall state whether the petitioner served honorably in an active-duty status during either World War I or during a period beginning September 1, 1939, and ending December 31, 1946, and was separated from such service under honorable conditions."  Both § 1439 and § 1440 provided for revocation of citizenship "if at any time subsequent to naturalization the person is separated from the military, air, or naval forces under other than honorable conditions, and such ground for revocation shall be in addition to any other provided by law."  8 U.S.C. §§ 1439(f), 1440(c).

In 1961, § 1440 was amended to include persons who served in the Korean Conflict.  *See* Act of Sept. 25, 1961, Pub. L. No. 87-301, § 8, 75 Stat. 650. 654.  Then, in 1968, § 1440 was

---

[4] The affidavit option remained unchanged.

6

amended to include those who served in the Vietnam War, as well as those who would serve in future-designated periods of hostility. *See* Act of Oct. 24, 1968, Pub. L. No. 90-633, § 1, Oct. 24, 1968, 82 Stat. 1343-44 (coverage extended to "any other period which the President shall designate by Executive Order as a period in which Armed Forces of the United States are or were engaged in military operations involving armed conflict with a hostile foreign force"). To date, the additional designated periods of hostilities have been the Persian Gulf Conflict from 1990 to 1991, *see* Exec. Order No. 12939, 59 Fed. Reg. 61231 (Nov. 22, 1994), and the War on Terrorism from September 11, 2001 to the present. *See* Exec. Order No. 13269, 67 Fed. Reg. 45, 287 (July 3, 2002).

In 2003, Congress made two substantive changes to the INA's provisions for naturalization based on military service. First, § 1439 was amended to reduce the time-in-service requirement from three years to one year. *See* National Defense Authorization Act for Fiscal Year 2004, § 1701, Pub. L. No. 108-136, 117 Stat. 1392, 1691-92 (2003) ("2004 NDAA"). Thus, since 2003, a lawful permanent resident ("LPR") "who has served honorably at any time in the armed forces of the United States for a period or periods aggregating one year, and, who, if separated from such service, was never separated except under honorable conditions" is eligible for naturalization. 8 U.S.C. § 1439; *see also* 8 C.F.R. § 328.2. Second, § 1440(a) was amended to include persons who served "in the Selected Reserve of the Ready Reserve" in addition to those who served in an "active-duty status." 2004 NDAA, § 1702, 117 Stat. at 1691-93. Thus, since 2003, "any person who . . . has served honorably as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status in the military, air, or naval forces of the United States" during certain designated periods of hostilities, which include any time from September 11, 2001, to the present, is eligible for naturalization if the person is a lawful permanent resident

7

or if the person enlisted while in the United States or in certain other specified locations. *See* 8

U.S.C. § 1440 (emphasis added); *see also* 8 C.F.R. § 329.2 ("To be eligible for naturalization

under section 329(a) of the Act, an applicant must establish that he or she: (a) Has served

honorably in the Armed Forces of the United States as a member of the Selected Reserve of the

Ready Reserve *or* in an active duty status in the Armed Forces of the United States . . . ."

(emphasis added)). Both § 1439 and § 1440 provide, as they have since 1952, that "[c]itizenship

granted pursuant to this section may be revoked . . . if the person is separated from the Armed

Forces under other than honorable conditions before the person has served honorably for a period

or periods aggregating five years." 8 U.S.C. §§ 1439(f); 1440(c).

## C.    Immigration Laws and Regulations

The INA provides that "[t]he sole authority to naturalize persons as citizens of the United

States is conferred upon the Attorney General," 8 U.S.C. § 1421(a), but the authority to make

decisions on all naturalization applications has been delegated to the USCIS,[5] including

applications based on military service pursuant to 8 U.S.C. § 1439 or § 1440.

USCIS requires all applicants for naturalization to submit USCIS Form N-400

("Application for Naturalization"). The application is first considered by a USCIS immigration

officer, who "conduct[s] a personal investigation of the person applying for naturalization" and

then "conduct[s] [an] examination" (often referred to as the "interview"). *See* 8 U.S.C. § 1446.

After the examination, the officer makes a decision to grant or deny the application. To be

---

[5] Prior to 2002, the Attorney General had delegated his naturalization authority to the
Immigration and Naturalization Service ("INS"). *See* 8 C.F.R. § 100.2 (1994). The Homeland
Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135, abolished the INS and transferred its
naturalization authority to the Bureau of Citizenship and Immigration Services (now USCIS)
within the Department of Homeland Security. Prior to 1990, § 1421 provided that only courts
had the power to grant or deny naturalization applications. *See* 8 U.S.C. § 1421(a) (1952-1990).

naturalized, an applicant must be found to be "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." *Id*. § 1447(a). If no determination is made within 120 days of the examination, the applicant may request a hearing in district court, which "may either determine the matter or remand, with appropriate instructions." *Id*. § 1447(b). If the application is denied, the applicant may request a hearing before another immigration officer. *Id*. § 1447(a). If denied again, the applicant is entitled to judicial review by a district court. *Id*. § 1421(c).

### D.    Naturalization Based on Military Service

DOD has no role to play in deciding whether to grant an application for naturalization based on military service, but it must certify that an applicant has "served honorably" and, if separated, was "separated under honorable conditions." *See* 8 U.S.C. § 1440(b)(3) ("service in the military, air or naval forces of the United States shall be proved by a duly authenticated certification from the executive department under which the applicant served or is serving"); 8 U.S.C. § 1439(b)(3) (applicant under § 1439 must provide "a certified statement from the proper executive department for each period of his service upon which he relies for the benefits of this section, clearly showing that such service was honorable and that no discharges from service, including periods of service not relied upon by him for the benefits of this section, were other than honorable (the certificate or certificates herein provided for shall be conclusive evidence of such service and discharge)").

To obtain that information, USCIS requires applicants for naturalization whose eligibility rests on their military service to submit USCIS Form N-426 ("Request for Certification of Military or Naval Service") ("N-426"). *See* 8 C.F.R. § 329.4; USCIS Policy Manual, Vol. 12, Part I, Ch. 5, § A ("An applicant filing for naturalization based on one year of honorable military service during peacetime *or* honorable service during a designated period of hostility must

9

complete and submit [Form N-400 and Form N-426]." (emphasis added)).  The USCIS will not

process an application for naturalization based on military service unless it is accompanied by a

completed N-426.  *See* USCIS Policy Manual, Vol. 12, Part I, Ch. 5, § A.

From October 1, 2001, through fiscal year 2018, USCIS has naturalized 129,587

members of the military.  *See* https://www.uscis.gov/military/military-naturalization-statistics.[6]

As of May 2017, the average USCIS processing time for all military naturalization applications

was approximately four months from start to finish.  *See Nio v. U.S. Dep't of Homeland Sec.*,

385 F. Supp. 3d 44, 56 (D.D.C. 2019) ("*Nio II*").

## II.    FACTUAL BACKGROUND

Prior to October 13, 2017, DOD had no formal policies or guidance that pertained to the

certification of N-426s.  What it did have, as discussed in detail later, *see infra* Section II.A.1

(Analysis), were more general regulations whose purpose was to "facilitate" naturalization at

basic training, *see* 32 C.F.R. § 94.4; DODI 5500.14, and Army and Navy personnel manuals that

indicated that an N-426 could be certified after one day of service.  (*See* Pls.' SJ Mot. Exs. 9, 11-

13).  Also, in 2009, the Army, in conjunction with USCIS, adopted a "Naturalization at Basic

Training Initiative" in order to provide expedited processing of naturalization applications for

noncitizen enlistees once they arrived at basic training.  *See Kirwa v. U.S. Dep't of Def.*, 285 F.

Supp. 3d 21, 29 (D.D.C. 2017) ("*Kirwa I*"); *Nio v. U.S. Dep't of Homeland Sec.*, 270 F. Supp. 3d

49, 55-56 (D.D.C. 2017) ("*Nio I*").  Under this Initiative, an enlistee received an N-426 before or

when he or she arrived at basic training.  Then, "USCIS conducte[d] all naturalization processing

---

[6] Over the past 100 years, more than 760,000 noncitizens have enlisted and obtained citizenship
through military service.  *See* Noncitizens in the U.S. Military, Migration Policy Institute Policy
Brief (May 2019) (available at https://www.migrationpolicy.org/research/noncitizens-us-
military-national-security-concerns-recruitment-needs).

including the capture of biometrics, the naturalization interview, and administration of the Oath

of Allegiance on the military base." *Kirwa I*, 285 F. Supp. 3d at 29; *see Nio I*, 270 F. Supp. 3d at

56. "The goal, which was generally achieved, was for the naturalization process to be completed

by the end of [basic training]," typically around 10 weeks. (AR 48 (7/7/17 Miller Decl. ¶ 9));

*Kirwa I*, 285 F. Supp. 3d at 29; *Nio I*, 270 F. Supp. 3d at 55-56. Between 2009 and 2013, USCIS

expanded the Initiative to the Navy, Air Force, and Marine Corps. *Kirwa I*, 285 F. Supp. 3d at

29 n.9.

The current litigation concerns the new N-426 policy that DOD adopted on October 13,

2017, but the events leading up to its issuance can be traced back to 2008, when DOD instituted

the MAVNI Pilot Program.

### A.    MAVNI Program

In 2008, pursuant to 10 U.S.C. § 504(b)(2), the Secretary of Defense authorized the

creation of the MAVNI Pilot Program, which allowed non-citizens who were not lawful

permanent residents to enlist in the United States military if it was determined that enlistment

would be vital to the national interest because they were "health care professionals" in certain

specialties or possessed "critical foreign language skills." (AR 46 (7/7/17 Miller Decl. ¶ 4).)

Before 2016, MAVNI enlistees in the Army's Selected Reserve (along with all other enlistees)

could expect to ship to basic training within approximately 180 days from the date of enlistment.

Then, once they arrived at basic training, they (along with all other noncitizen enlistees who

wanted to naturalize), would be able to get a certified N-426 and apply for naturalization. (AR

48 (7/7/17 Miller Decl. ¶ 9)); *see also Nio I*, 270 F. Supp. 3d at 55. And, through the

Naturalization at Basic Training Initiative, MAVNIs (and other noncitizens who sought to

naturalize) were usually able to complete the naturalization process before they left basic

training, i.e., within approximately 10 weeks. *Id*.

11

### 1. Enhanced Security Screening for MAVNIs and the September 30, 2016 DOD Memorandum)

Since its inception, the MAVNI program has generated national security concerns within

DOD.  As a result, DOD has sought to strengthen the security screening requirements for

MAVNI enlistees to join the military.  *See Nio II*, 385 F. Supp. 3d at 48-49 (providing detailed

description of the evolution of the security screening requirements imposed on MAVNI

enlistees); (*see also* AR 50-51 (7/7/17 Miller Decl. ¶¶ 12-15)).  The most significant change

came on September 30, 2016, when DOD, citing national security concerns, issued a

memorandum that provided that MAVNIs could not ship to basic training until DOD's enhanced

security screening and its "military service suitability determination" ("MSSD")[7] were

completed. [8]  (*See* AR 114-122 (Sept. 30, 2016 DOD Memorandum).)[9]

### 2. Effect of the September 30, 2016 DOD Memorandum on MAVNI Naturalization

The September 30, 2016 DOD Memorandum substantially increased the time between

_____

[7] The requirements in the September 30, 2016 DOD Memorandum can be divided into two phases: the "investigatory phase" and the 'adjudicatory phase."  *See Nio II*, 385 F. Supp. 3d at 51-52.  The investigatory phase includes the enhanced security screening, which generates information about the enlistee, while the adjudicatory phase is what DOD does with that information.  *Id*.  The adjudicatory phase has two steps.  *Id*.  First, based on the information gathered during the investigatory phase, DOD's Central Adjudication Facility makes a "military service suitability recommendation" ("MSSR").  *See id*.  The MSSR is provided to the military service (e.g. the Army), which then renders a final MSSD, based on the MSSR, and the service's own needs.  *See id.* at 52.

[8] The September 30, 2016 DOD Memorandum "reinforced that MAVNI recruits [had to] complete four vetting requirements to receive a[n] [MSSD]: (1) either a Tier 3 or Tier 5 background investigation (based on assessment of their counterintelligence risk profile, (2) a National Intelligence Agency Check (NIAC), (3) a CI-focused security review (CIFSR), and (4) an issue-oriented interview and/or issue-oriented polygraph, if needed to resolve any foreign influence or foreign preference concerns."  (AR 33 (Decl. of Stephanie Miller, July 28, 2017) ("7/28/17 Miller Decl.").)

[9] Although the MAVNI program was formally extended through September 30, 2017, in fact the program stopped accepting new recruits in June 2016. *See Nio II*, 385 F. Supp. 3d at 51 n.7.

MAVNIs' enlistment and their shipping to basic training.[10]  *See Nio II*, 385 F. Supp. 3d at 52.

That, in turn, caused considerable delay, sometimes amounting to several years, for a MAVNI to

receive a certified N-426.  In response, Reservists were unable to submit a naturalization

application.  MAVNIs who were in the Army Selected Reserve's Delayed Training Program

("DTP"),[11] however, were already serving because they were participating in drilling with their

reserve unit while they waited for their security screening and MSSD to be completed.  *See Nio*,

385 F. Supp. 3d at 52.  As the time to ship grew increasingly lengthy in late 2016 through mid-

2017, approximately 500 MAVNIs requested and received certified N-426s based on their

participation in at least one day of drilling.  *See id*. at 53.  With their N-426s in hand, these

MAVNI Reservists were ready to file their applications for citizenship.  *Id*.

### 3.    USCIS's July 7, 2017 Guidance

When DOD learned in early 2017 that MAVNI Reservists were obtaining N-426s before

completing their enhanced security screening, the DOD, in collaboration with USCIS, put a

"hold," in April 2017, on naturalizing the MAVNIs who had already obtained an N-426 but were

still drilling in the DTP.  *See Nio II*, 385 F. Supp. 3d at 53-56.

Following the issuance of the "hold," USCIS adopted a guidance on July 7, 2017, that

instructed USCIS personnel not to allow a MAVNI naturalization applicant to proceed to

interview until "all enhanced DOD security checks are completed" because "USCIS has

determined that the completion of DOD background checks is relevant to a MAVNI recruit's

---

[10] In October 2017, DOD's estimated time for completing just one part of the enhanced security screening (the Tier 5 investigation) was over 400 days.  (AR 33 (7/28/17 Miller Decl.) ("MAVNI applicants' completion of the Tier 5 background investigation [took] on average 422 days during a period from 2014-2017."); *see Kirwa I*, 285 F. Supp. at 30.

[11] The DTP "allows . . . members of the Selected Reserve to attend drill periods for pay and benefits . . . during the period prior to assignment to initial military training (also known as basic training."  (AR 34 (7/28/17 Miller Decl.).)

13

eligibility for naturalization," specifically the requirements that an applicant demonstrate "good moral character and attachment to the U.S. Constitution." *Nio II*, 385 F. Supp. 3d at 54.

In addition to the "hold" on the naturalization of MAVNI Reservists, in the spring of 2017, DOD began a review of its N-426 "policy," and while that review was proceeding, it stopped issuing certified N-426s to MAVNI Reservists who were drilling in the DTP, because it took the view that active duty (i.e. basic training) was a necessary precondition to an honorable service determination. (AR 53 (7/7/17 Miller Decl. ¶ 19)); *see also Kirwa I*, 285 F. Supp. at 33; *Nio I*, 270 F. Supp. 3d at 59. Then, on August 17, 2017, the Chief of the Army Reserve issued a memorandum that stated: "Effective immediately, I withhold authority to certify the honorable service (N-426) of Soldiers who have not yet attended Initial Entry Training (IET)."[12] *Nio I*, 270 F. Supp. 3d at 60. This order, which formally blocked the approximately 2,000 MAVNIs who had enlisted in the Army's Selected Reserve and were drilling in the DTP from obtaining a certified N-426, prompted the filing of the *Kirwa* case. *See* Compl., *Kirwa*, ECF No. 1. But, before there was any substantive ruling in *Kirwa*, the Army's August 17, 2017 memorandum was superseded by DOD's N-426 Policy.

### B.    DOD's October 13, 2017 N-426 Policy

On October 13, 2017, DOD issued its first "formal guidance" pertaining to the certification of N-426s ("N-426 Policy"). (*See* AR 6-9.) The N-426 Policy applies to all noncitizen service members (LPRs and MAVNIs) serving in Active Components (Army, Navy, Air Force, Marines, and Coast Guard) or the Selected Reserve. (AR 6.) Sections I and II establish the "criteria" that a service member must meet before an N-426 will be certified:

---

[12] In the Army, Initial Entry Training includes both Basic Combat Training ("boot camp") and Advanced Individual Training.

14

Section I applies to individuals who enlisted or accessed after October 13, 2017; Section II applies to individuals who enlisted or accessed before October 13, 2017. Section III provides for the revocation of previously issued N-426s under certain circumstances.

### 1.  Section I

#### a.  Minimum Service Requirements

In this litigation, the critical part of the N-426 Policy is found in Section I, paragraph 3, which sets out the "Military Training and Required Service" criteria that an individual who enlisted or accessed after October 13, 2017, must meet. Service members covered by Section I include LPRs and MAVNIS in Active Components and LPRs in the Selected Reserve of the Ready Reserve (but not MAVNI Reservists since they enlisted and accessed before October 13, 2017). The purpose of these criteria, as stated in the N-426 Policy, is to ensure that the Service Member "has served in a capacity, for a period of time, and in a manner that permits an informed determination as to whether the member served honorably." (AR 7.) There are two sets of criteria: one for "Service Members in an Active Component" ("Active Minimum Service Requirement) and one for "Service Members in the Selected Reserve of the Ready Reserve" ("Reservist Minimum Service Requirement"). The Active Minimum Service Requirement provides that a service member in an Active Component can only obtain a certified N-426 if that service member has:

- Successfully completed the basic training requirements of the armed forces of which he/she is a member; AND

- Completed at least 180 consecutive days of active duty service, inclusive of the successful completion of basic training . . . .

The Reservist Minimum Service Requirement provides that a service member in the Selected Reserve of the Ready Reserve can only obtain a certified N-426 if that service member has:

- Successfully completed the basic training requirements of the armed

15

forces of which he/she is a member; AND

- Completed at least one year of satisfactory service toward non-regular retirement in accordance with [DODI] 1215.07, "Service Credit for Non-Regular Retirement," as a member of the Selected Reserve, inclusive of the member's successful completion of basic training . . . .

The minimum time-in-service requirements for all service members and the imposition of an active duty requirement for Reservists are the focus of this litigation.

### b.      Screening and Suitability Requirements

Section I, paragraph 2, of the N-426 Policy provides that service members must "complete[] applicable screening and suitability requirements" before they can obtain a certified N-426. Those requirements are different for MAVNIs and LPRs. MAVNIs must:

> [be] the subject of a completed National Intelligence Agency Check (NIAC); Tier 3 or Tier 5 Background Investigation, as applicable; counterintelligence-focused security review; counterintelligence interview; and a[n] [MSSD], favorably adjudicated in accordance with  the 9/30/2016 DOD Memorandum] and OUSD(P&R) memorandum of October 13, 2017, Military Accessions Vital to the National Interest Pilot Program.[13]

LPRs must:

> have met prescribed screening requirements set forth in Department of Defense Instruction 1304.26, "Qualification Standards for Enlistment, Appointment and Induction," and other applicable DoD or Military Department policy, and are the subject of a favorably adjudicated MSSD . . . .

However, for several reasons, these screening and suitability requirements are no longer impacting any class member's ability to obtain an N-426. Thus, plaintiffs are not challenging them in this case.[14]

---

[13] The October 13, 2017 MAVNI memorandum includes "supplemental policy guidance regarding the management of Service members accessed through the MAVNI Pilot Program." (AR 12-14.)

[14] As noted *supra*, the only MAVNIs covered by Section I have enlisted in Active Components. And MAVNIS, first under the September 30, 2016 DOD Memorandum and now by statute, *see* 10 U.S.C. § 504(b)(3)(A), may not ship to basic training until they have completed these same

16

## 2. Section II

Section II of the N-426 Policy applies to service members who enlisted or accessed

before October 13, 2017 (which includes all MAVNI Reservists). Section II differs from Section

I only with respect to "Military Training and Required Service," because it imposes no specific

requirements as to the time or manner of service[15] (i.e. no active duty requirement and no

minimum time-in-service requirement).[16]

---

screening and suitability requirements. Thus, MAVNIs will necessarily have completed all the N-426 screening and suitability requirements before they have served for even a single day, i.e., before they could ever be eligible for an N-426. As a result, plaintiffs do not challenge the screening and suitability requirements for active MAVNIs.

With respect to LPRs, the screening and suitability requirements in the N-426 policy are no longer being enforced by DOD due to a series of events related to these same requirements in an independent DOD policy. Briefly, on the same day it issued the N-426 Policy, DOD issued another policy that required LPRs, for the first time, to complete security screening and have a favorable MSSD before shipping to basic training. (AR 10-11 ("LPR Screening/MSSD Policy"). The delays in ship dates caused by the LPR Screening/MSSD Policy (which led to delays in LPRs ability to apply for naturalization) led to litigation. An APA challenge to enjoin this policy was initially successful, but the Ninth Circuit reversed. *See Kuang v. U.S. Dep't of Def.*, 340 F. Supp. 3d 873, 890 (N.D. Cal. 2018), *vacated and remanded*, 778 F. App'x 418 (9th Cir. 2019). DOD, however, then opted not to resume enforcement of the LPR Screening/MSSD Policy, replacing it as of July 30, 2019, with a new "Expedited Screening Protocol" ("ESP"). (*See* Defs.' Supp. Br. Ex. 3, July 1, 2020, ECF No. 32-3 ("Defs.' 7/1/20 Supp. Br.").) The ESP must be initiated, but not completed, before a recruit can ship basic training. (*Id.*) DOD has thus stopped requiring that LPRs (both Actives and Reservists) complete any security screening or have a favorable MSSD to obtain a certified N-426. (*See* Defs.' 7/1/20 Supp. Br. at 3; Defs.' Supp. Br. at 8, July 10, 2020, ECF No. 34.) Since there is no requirement that LPRs must complete any type of security screening or suitability determination to obtain an N-426, plaintiff abandoned this claim as well. (*See* Hr'g Tr. at 9, July 16, 2020, ECF No. 37 ("7/16/20 Tr.").)

[15] The full text of Section II.3 reads:

> Military Training and Required Service: The Service Member has served in a capacity, for a period of time, and in a manner that permits an informed determination that the member has served honorably as a member of the Selected Reserve of the Ready Reserve or member of an active component of a military or naval force of the United States, as determined by the Secretary of the Military Department concerned.

(AR 8.)

[16] As discussed further *infra*, the *Kirwa* case concerned the "applicable screening and suitability

### 3. Section III

Section III provides for the revocation of already issued N-426s if the service member accessed prior to October 13, 2017, had submitted a naturalization application to USCIS that had not yet been granted, and the service member had not completed all applicable security and screening requirements imposed by the July 7 Guidance.[17]  (*See* AR 9.)

### 4. The O-6 Requirement

Finally, the N-426 Policy provides that certifications must be made either by "the Secretary of the Military Department concerned" or, if delegated by the Secretary, "a commissioned officer serving in the pay grade of O-6 or higher" ("O-6 Requirement").  (AR 6.) But on April 24, 2020, DOD issued an update to the N-426 Policy that provides: "Upon receipt from a qualified applicant of [USCIS] Form N-426, 'Request for Certification of Military or Naval Service,' the certifying official will process it with priority and return it to the Service member concerned within 30-days of submission."[18]  (AR 1.)  As represented by defense counsel,"[a]ccording to officials within DOD's Office of the Under Secretary for Personnel and Readiness, the 30-day time period contemplated by the April 24, 2020 policy update begins

---

requirements" that applied to MAVNI Reservists under Section II.

[17] As discussed further *infra*, the *Nio* case addressed Section III.

[18] DOD issued its update in response to a directive in the National Defense Authorization Act for Fiscal Year 2020 ("2020 NDAA"), which provides that the:

> Secretary of Defense shall publish regulations for submission and processing of a completed United States Citizenship and Immigration Services Form N-426, by a member of the Armed Forces.  Such regulations shall designate the appropriate level for the certifying officer as well as establish time requirements for the form to be returned to the member of the Armed Forces.

133 Stat. 1198, 1356 (2019) (codified at 10 U.S.C. § 1781, Note).

18

when the first person in the chain of command receives the N-426 request."  (Defs.' Supp. Br. at

1, July 28, 2020, ECF No. 42 ("Defs.' 7/28/20 Supp. Br.").)

Plaintiffs sought to challenge the O-6 requirement as causing delay in the processing of

N-426 requests, but as explained in this Court's opinion on class certification, in light of the

April 24, 2020 update, there is no named plaintiff with standing to challenge the O-6

Requirement.  *See Samma*, 2020 WL 4501000, at *5-6.  Accordingly, those claims have been

dismissed.

### III.    MAVNI-RELATED LITIGATION

Section I of the N-426 Policy, as it applies to active duty MAVNIs and LPRs and to LPR

Reservists, is at issue in *Samma*.  But before the Court can address *Samma*, it must again detour

to further explain its rulings in *Kirwa*, which challenged DOD's refusal to grant N-426s to

MAVNI Reservists under Section II of the N-426 Policy, and in *Nio*, which challenged DOD's

policy of revoking the N-426s given to the MAVNI Reservists under Section III, and USCIS's

refusal, as set forth in the July 7, 2017 Guidance, to process a naturalization application unless

the MAVNI had completed both the security screening during the investigatory stage and the

suitability or MSSD determination made during the adjudicatory phase.  *See supra* n.7.

### A.    Kirwa

The *Kirwa* plaintiffs were MAVNI Reservists who had been drilling in the DTP while

they waited to ship to basic training.  They had sought but had been unable to obtain certified N-

426s.  They filed suit in September 2017, after the Army's August 17, 2017 Memorandum

formally ordered that no N-426s would be issued before a reservist started basic training, and

they challenged that policy as unlawfully imposing an active duty requirement in contravention

of § 1440.  (Compl., *Kirwa*, ECF No. 1.)  They also filed a motion for a preliminary injunction.

The Court initially collapsed the motion for a preliminary injunction with a hearing on the merits

19

because the sole issue was an issue of law: did the imposition of an active duty requirement to obtain a certification of honorable service for individuals serving in the Selected Reserve contravene § 1440? Shortly before that issue could be fully briefed, DOD abruptly changed gears and issued the October 13, 2017 N-426 Policy. Section II of that policy applied to the *Kirwa* plaintiffs. Contrary to prior representations by DOD, the policy did not include an active duty requirement." (*See* AR 8); *see also Kirwa I*, 285 F. Supp. 3d at 34. In light of DOD's sudden change in position, the Court had to reverse course and proceeded with a hearing on the motion for a preliminary injunction. *Kirwa I*, 285 F. Supp. 3d at 34-35.

The Court concluded that plaintiffs were likely to succeed on their claim that the security screening and suitability requirements in Section II for issuance of an N-426 are arbitrary and capricious in violation of § 706(2)(A) of the APA because "DOD ha[d] given no reasoned justification why certifying a form N–426 for immigration and naturalization purposes implicates our national security." *Id*. at 39. The Court also found that the plaintiffs were likely to succeed on their claim that Section II violated § 706(1) of the APA because DOD had a duty to certify N-426s based on existing service records. *Id*. at 41-42. Accordingly, the Court issued a preliminary injunction enjoining the application of Section II of the N-426 Policy to a provisionally-certified class of MAVNIs who were drilling in the Selected Reserve's DTP and had not received a certified N-426. *Id*. at 21. Specifically, DOD was enjoined from "refusing to sign and issue Form N-426s to members of the Selected Reserve pursuant to Section II of DOD's October 13, 2017 Guidance," and from "refusing to certify MAVNI enlistees who have served for one day or more in the Selected Reserve as having honorable service, except as related to the conduct of an individual plaintiff or class member as reflected in that soldier's service record and based on sufficient grounds generally applicable to all members of the military." Amended

20

Order at 1, *Kirwa*, ECF No. 32.  It also ordered that "after members of the provisionally-certified class submit or resubmit N-426s to their military officer ranked O6 or higher, defendants should use their best efforts to certify or deny Form N-426s, as was done for the *Nio* plaintiffs, within two business days of receipt of Form N-426."  *Id*. at 1-2.  Further, the Court granted plaintiffs' unopposed motion for class certification, certifying a class that "consists of all persons who (1) have enlisted in the U.S. military through the Military Accessions Vital to the National Interest ("MAVNI") program prior to October 13, 2017, (2) have served in the Selected Reserve of the Ready Reserve ("Selected Reserve"), and (3) have not received a completed and duly authenticated Form N-426."  Order, *Kirwa*, Dec. 1, 2017, ECF No. 48.  The Court then denied defendants' motion to dismiss plaintiffs' APA claims.  *Kirwa II*, 285 F. Supp. 3d 257, 266-68 (D.D.C. 2018) ("*Kirwa II*").  Defendants have not appealed the preliminary injunction.

Over the last three years, 1695 N-426s have been requested and issued.  *See* Status Report, *Kirwa*, July 24, 2020, ECF No. 230.  Only ten have been requested and issued in the last eight months.  *See id.*; Status Report, Kirwa, Jan. 2, 2020, ECF No. 201.  Generally, DOD has been able to comply with a two-day turnaround from submission of the N-426 to return, *see id*.; *see also* Defs.' Opp'n to Pls.' Mot. to Enforce Court Order Ex. J, *Kirwa*, Nov. 29, 2017, ECF No. 41 (describing how DOD will achieve 2-day turnaround ordered by Court), and once a *Kirwa* class member receives a certified N-426, he/she becomes part of the *Nio* class.

### B.    Nio

The plaintiffs in *Nio* were MAVNI Reservists who had obtained certified N-426s based on one or more days of drilling while in the DTP and who had filed applications for naturalization, but whose applications were not being processed by USCIS due to the informal "hold" agreed to by USCIS at DOD's request, pending DOD's completion of its security screening and suitability determinations.  They filed suit in May 2017 against DOD and

21

DHS/USCIS, challenging the hold, on their own behalf and on behalf of a putative class. *See* Compl. *Nio*, ECF No. 1. Then, USCIS issued the July 7 Guidance, causing plaintiffs to amend their complaint and their motion for a preliminary injunction to challenge that Guidance. They also added a challenge to DOD's ongoing review of its N-426 "policy" and what appeared to be its current position that active duty was required to be eligible for a certified N-426. *Nio I*, 270 F. Supp. at 61.

The Court denied plaintiffs' motion for a preliminary injunction, finding that DOD's review of its N-426 policy did not pose an imminent threat of harm to the plaintiffs and that they were not likely to succeed on the merits of their claim that USCIS's July 7 Guidance was arbitrary and capricious in light of the national security concerns that had motivated its adoption. *See id.* at 62-65.

Thereafter, DOD issued its N-426 Policy, including Section III which required the revocation of N-426s issued to individuals who had not yet completed DOD's enhanced security screening and suitability determinations. The *Nio* plaintiffs again amended their complaint to add a challenge to Section III, and they filed a new motion for a preliminary injunction against DOD.

On October 27, 2017, the Court granted plaintiffs' motion for class certification, certifying a class to challenge (1) DHS's/USCIS's decision in the July 7 Guidance to await DOD's completion of the enhanced security screening of MAVNI enlistees; and (2) DOD's adoption of Section III. *See Nio v. U.S. Dep't of Homeland Sec.*, 323 F.R.D. 28, 30 (D.D.C. 2017).[19] The Court also granted the motion for a preliminary injunction as to Section III, for the

---

[19] The certified class in *Nio*

> consists of all persons who have (i) enlisted in the Selected Reserve through the MAVNI program prior to October 13, 2017; (ii) served honorably with a Selected

22

same reasons it enjoined the application of Section II in *Kirwa*. *See* Order, *Nio*, Oct. 27, 2017,

ECF No. 74. As with the preliminary injunction in *Kirwa*, the defendants in *Nio* did not appeal.

As for the *Nio* plaintiffs' remaining challenge to the USCIS's July 7 Guidance, on May

22, 2019, the Court granted partial summary judgment to the plaintiffs, concluding that the July 7

Guidance was arbitrary and capricious to the extent it required USCIS to wait for DOD to issue

an MSSD because "USCIS's purported reasons for waiting for these military suitability

adjudications do not comport with the evidence before the Court." *Nio II*, 385 F. Supp. 3d at 47.

Specifically, the Court found that USCIS could not wait for DOD's MSSD because the

adjudicatory phase of DOD's process did not generate any new information that would be

relevant to USCIS's decision on whether an applicant satisfied the requirements for

naturalization. *See id*. at 67. Moreover, not only did the adjudicatory process not render any

relevant information, if an enlistee received an unfavorable MSSD before completing 180 days

of service, he or she necessarily received an uncharacterized discharge,[20] and USCIS

automatically rejected these applicants as not having received an honorable discharge and thus

---

Reserve unit through participation in at least one qualifying drill period or served
in an active-duty status; (iii) submitted N-400 Applications for Naturalization; (iv)
been issued Form N-426s certifying honorable service as a member of the
Selected Reserve or in active-duty status; and (v) have had the processing or final
adjudication of their naturalization applications (including naturalization itself)
withheld or delayed because of (a) a final USCIS processing hold for MAVNIs,
(b) a DOD N-426 policy review, (c) a DOD N-426 recall/decertification policy,
(d) enhanced DOD security screenings, (e) a DOD CAF adjudication, (f) a
national security determination, and/or (g) military service suitability vetting
determination.

Order, *Nio*, Oct. 27, 2017, ECF No. 72.

[20] In the military, a service member remains in "entry-level" status until he or she has completed
basic training and served for 180 days. *See Nio II*, 385 F. Supp. at 64. If a soldier is discharged
from entry-level status, the discharge is not characterized as honorable or other than honorable,
but rather by the neutral "uncharacterized" classification. *Id.*

23

ineligible for naturalization. *Id*. at 64-65. Given this scenario, the Court concluded that USCIS had abdicated its statutory duty to "conduct its own investigation of eligible applicants, as required by 8 U.S.C. § 1446(b)," and "to independently assess [their ] good moral character or attachment to the Constitution." *Id*. at 67-68. Accordingly, the Court vacated the MSSD portion of the July 7 Guidance, *id*. at 69, and it ordered defendants to file periodic reports on the status of the naturalization applications filed by *Nio* class members. *See* Order, *Nio*, ECF No. 259.

At the time *Nio* was filed, there were an estimated 2,400 MAVNI Reservists in the Army's DTP. *See Nio II*, 385 F. Supp. 3d at 53. As of July 27, 2020, 1957 members of the *Nio* class have been naturalized, 1217 of them since the Court's ruling on May 22, 2019. *See* Status Report at 2, *Nio*, ECF No. 301. Currently, there are only 68 class members with pending naturalization applications,[21] 26 of whom have already been interviewed by USCIS and 5 of whom have interviews scheduled. *Id*. at 2-3.[22] On August 20, 2020, the Court entered final judgment in favor of the *Nio* plaintiffs. *See* Judgment, *Nio*, ECF No 307.

---

[21] Of the 68 pending applications, 36 were filed prior to August 1, 2019, and 32 were filed after August 1, 2019. Status Report at 2-3, *Nio*, ECF No. 301. Of the 36 applications that were pending prior to August 1, 2019, all but 11 have either been interviewed or been scheduled for an interview. *Id*.

[22] Two other MAVNI cases on this Court's docket merit brief mention. First, there is *Calixto*, which was filed by a putative class of MAVNIs who had been discharged from the Army, either from the Army's Delayed Entry Program or the Selected Reserve's DTP, due to unfavorable MSSDs. *Calixto v. United States Dep't of the Army*, No. 18-cv-1551, 2019 WL 2139755, at *1 (D.D.C. May 16, 2019). The *Calixto* plaintiffs sued the Department of the Army, claiming that when they were discharged, the Army violated Army and DOD regulations, as well as the soldiers' procedural due process rights. *Id*. at *1.

The last case is *Miriyeva*, which was filed by MAVNIs whose applications for naturalization had been denied because they had received "uncharacterized" discharges, which USCIS viewed as not having been "separated under honorable conditions." *Miriyeva v. U.S. Citizenship & Immigration Servs.*, 436 F. Supp. 3d 170, 173 (D.D.C. 2019). The plaintiffs challenged USCIS's "policy" under the APA and the Constitution. *Id*. The Court granted defendants' motion to dismiss for lack of jurisdiction on the ground that 8 U.S.C. § 1421, which provides for judicial review of the denial of a naturalization application, precluded the plaintiffs' claims. *Id*. The

## IV.    SAMMA'S PROCEDURAL HISTORY

On April 28, 2020, six individuals who are noncitizens currently serving in the United States Armed Forces, on their own behalf and on behalf of a putative class, sued DOD and its Secretary, Mark Esper, claiming that the N-426 Policy was unlawfully preventing them from obtaining certified N-426s and submitting applications for naturalization. (*See* Compl., ECF No. 1.) Plaintiffs brought claims under the APA, challenging the N-426 Policy as arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A); not in accordance with law, 5 U.S.C. § 706(2(A); in excess of statutory jurisdiction, *see* 5 U.S.C. § 706(2)(C); results in unlawfully withheld and unreasonably delayed agency action, *see* 5 U.S.C. § 706(1); and was enacted without notice and comment, *see* 5 U.S.C. § 553; 5 U.S.C. § 706(2)(D). With their complaint, plaintiffs filed a motion for preliminary injunction, which was converted into a motion for summary judgment, and a motion for class certification.

As detailed in the Court's class certification opinion, *Samma*, 2020 WL 4501000, at *2-*3, plaintiffs subsequently clarified their claims and limited them to Section I and to their challenge to the O-6 Requirement and the Minimum Service Requirements.[23]

During the course of briefing, defendants reported that since the complaint was originally filed, five of the six named plaintiffs had received N-426s, rendering their claims moot, and leaving Ahmad Isiaka[24] as the only named plaintiff with a live claim. *Samma*, 2020 WL

---

plaintiffs' appeal is pending before the D.C. Circuit.

[23] As noted, plaintiffs initially considered a challenge to the security screening and suitability requirements, but they ultimately abandoned that attack once it became apparent, as previously explained, *see supra* n.14, that those requirements were not impeding their ability to obtain a certified N-426.  *Id*.

[24] Isiaka is an LPR who enlisted in the Selected Reserve of the U.S. Army Reserve in January 2020. (Am. Compl. ¶ 21.) He began drilling in February 2020, and he was scheduled to ship to basic training on August 3, 2020.  (*Id*. ¶¶ 21, 105, 106.)

25

4501000, at *3. Plaintiffs then amended their complaint on June 8, 2020, adding two new plaintiffs, Timotius Gunawan[25] and Rafael Leal Machado,[26] neither of whom had met the Minimum Service Requirements or had received a certified N-426.

On July 16, 2020, the Court held argument on the motion for class certification and the cross-motions for summary judgment. After the argument, plaintiffs learned that Isiaka had received a certified N-426 on July 21, 2020, even though he had not yet satisfied the Reservist Minimum Service Requirements. *Samma*, 2020 WL 4501000, at *7. Defendants advised the Court that Isiaka had received an N-426 in error, signed by a commander who was "unaware of the N-426 policy," but that the Army did not intend to revoke it and that their position is that Isiaka cannot represent the Reservist subclass because his claim is now moot. (Defs.' 7/28/20 Supp. Br. at 4.) On July 29, 2020, Gunawan, in another apparent error because he had not yet met the Active Minimum Service Requirements, received a certified N-426. (*See* Pls.' Notice Regarding Pl. Timotius Gunawan, July 31, 2020, ECF No. 43.)

On August 4, 2020, the Court granted plaintiffs' motion for class certification in part. *Samma*, 2020 WL 4501000, at *10. The Court concluded that (1) no plaintiff had standing to challenge the O-6 Requirement; (2) the claims of the five plaintiffs who received their N-426s before the filing of the amended complaint should be dismissed as moot; and (3) even though Isiaka and Machado received certified N-426s before the Court issued its ruling on class certification, the "relation-back" doctrine should be applied, allowing them to be appointed as

---

[25] Gunawan is an LPR who enlisted in the U.S. Navy in November 2019. (Am. Compl. ¶ 25.) He shipped to basic training in February 2020, and he is currently serving on active duty. (*Id*. ¶¶ 25, 130, 131.)

[26] Machado is an LPR who enlisted in the U.S. Air Force in October 2019. (Am. Compl. ¶¶ 26.) He shipped to basic training in January 2020, and he is currently serving on active duty. (*Id*. ¶¶ 26, 137, 138.)

26

class representatives even though their individual claims are technically moot.[27]  *Id*. at *5-7.  The

Court certified two subclasses: one to challenge the Active Minimum Service Requirement,

represented by Gunawan and Machado, and one to challenge the Reservist Minimum Service

Requirement, represented by Isiaka.  *Id*. at *10.  Plaintiffs' counsel have been appointed as Class

Counsel.  *Id*.

The issue now before the Court is whether DOD's Minimum Service Requirements

violate the APA.  There are two such requirements under Section I of the N-426 Policy:

> (1) The Active Minimum Service Requirement provides that MAVNIs and LPRs
> who serve in an Active Component must complete at least 180 consecutive days
> of active duty service, inclusive of the successful completion of basic training,
> before they can obtain an N-426.

> (2) The Reservist Minimum Service Requirement provides that LPR Reservists
> must complete at least one year of satisfactory service toward non-regular
> retirement in accordance with [DODI] 1215.07, "Service Credit for Non-Regular
> Retirement," as a member of the Selected Reserve, inclusive of the member's
> successful completion of basic training, before they can obtain an N-426.

(AR 7-8.)

## ANALYSIS

Plaintiffs claim that the Minimum Service Requirements in the N-426 Policy violate the

---

[27] The Court certified a class consisting of "all individuals who: (a) are noncitizens serving in the U.S. military; (b) are subject to Section I of the October 13, 2017 N-426 Policy (AR 6) ("N-426 Policy"), as updated by DOD's April 24, 2020 Memorandum (AR 1); (c) have not received a certified N-426; and (d) are not Selected Reserve MAVNIs in the class certified in *Kirwa v. U.S. Dep't of Defense*, No. 17-cv-1793 (D.D.C. Dec. 1, 2017)."  (Order, Aug. 4, 2020, ECF No. 44.) The certified class is divided into an "Active Subclass" and a "Reservist Subclass."  The Active Subclass includes all individuals in the Class who are noncitizens serving in an Active Component of the U.S. military and have not satisfied the Active Minimum Service Requirements in Section I.3.a of the N-426 Policy.  The Reservist Subclass includes all individuals in the Class who are lawful permanent residents (LPRs) serving in the Selected Reserve of the Ready Reserve and have not satisfied the Reservist Minimum Service Requirements in Section I.3.b of the N-426 Policy, excluding the plaintiff in *Kotab v. U.S. Dep't of the Air Force*, No. 2:18-cv-2031, 2019 WL 4677020 (D. Nev. Sept. 25, 2019).

APA.  Defendants disagree, arguing first that the N-426 Policy is not subject to APA review

because it concerns matters that are "committed to agency discretion by law," or, in the

alternative, if the N-426 Policy is reviewable, none of plaintiffs' APA claims have merit.  The

Court will first address reviewability and then, because it concludes that the challenged agency

action is reviewable, turn to plaintiffs' APA claims.[28]

## I.    REVIEWABILITY

The APA provides that "[a] person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof."  5 U.S.C. § 702.  The Supreme Court has long interpreted the

APA as embodying a " basic presumption of judicial review."  *Abbott Laboratories v. Gardner*,

387 U.S. 136, 140 (1967); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.

Ct. 1891, 1905 (2020).  "The presumption may be rebutted only if the relevant statute

'preclude[s] review,' 5 U.S.C. § 701(a)(1), or if the action is 'committed to agency discretion by

law,' § 701(a)(2)."  *Weyerhaeuser v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018).

Defendants argue that plaintiffs cannot challenge the N-426 policy under the APA

because it is an agency action that is committed to agency discretion by law.[29]  As defendants

recognize, this Court has rejected this argument on two prior occasions.  *See Kirwa I*, 285 F.

---

[28] Federal Rule of Civil Procedure 56(a) requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"; however, the summary judgment standard functions differently in APA cases "because of the limited role of a court in reviewing the administrative record." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (citation and internal quotation marks omitted).  In those cases, a court employs summary judgment to "determin[e] whether, as a matter of law, an agency action is supported by the administrative record and is consistent with the APA."  *Animal Legal Def. Fund, Inc. v. Vilsack*, 237 F. Supp. 3d 15, 20 (D.D.C. 2017).

[29] In *Kirwa*, defendants also argued that the N-426 policy was unreviewable under § 706(a)(1) because the relevant statute, 8 U.S.C § 1440, "precludes review," *see Kirwa I*, 285 F. Supp. at 35; *Kirwa II*, 285 F. Supp. at 266, but they do not press that argument here.

28

Supp. 3d at 35-39 (D.D.C. 2017); *Kirwa II*, 285 F. Supp. 3d at 266-68.  But defendants urge the

Court to reconsider its conclusion, noting in particular that another district court has since

reached the opposite conclusion, *see Kotab v. U.S. Dep't of the Air Force*, No. 2:18-cv-2031,

2019 WL 4677020 (D. Nev. Sept. 25, 2019), and that the Ninth Circuit has concluded that

DOD's LPR Screening/MSSD Policy, *see supra* note 14, is unreviewable.  *See Kuang v. U.S.*

*Dep't of Defense*, 778 F. App'x 418 (9th Cir. 2019).  The Court has reexamined the issue.  But in

the end, it reaches the same conclusion—the N-426 Policy is reviewable under the APA.

To "honor the presumption of review, [the Supreme Court] ha[s] read the exception in

§ 701(a)(2) quite narrowly."  *Weyerhaeuser*, 139 S. Ct. at 370.  First, § 706(a)(2) has been

applied to "certain categories of administrative decisions that courts traditionally have regarded

as committed to agency discretion."  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (internal

quotation marks omitted); *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).

Second, § 706(a)(2) has also been applied in "those rare circumstances where the relevant statute

is drawn so that a court would have no meaningful standard against which to judge the agency's

exercise of discretion."  *Lincoln v. Vigil*, 508 U.S. at 191 (internal quotation marks omitted); *see*

*Dep't of Commerce v. New York*, 139 S. Ct. at 2568.

Defendants first argue that the administrative decision at issue—which they define as the

"certification of a service member's service as honorable"—is the type of decision "to which

courts have routinely deferred" because it requires "military expertise" or "military judgment."

(Defs.' SJ Mot. at 17-18 ("the military characterizes service to ensure proper military discipline

and control" and "determinations requiring military expertise are not proper subjects of judicial

intervention").)  To support their argument, defendants rely on cases where courts have refused

to review the military's characterization of service upon discharge, *see Patterson v. Lamb*, 329

29

U.S. 539, 540-41 (1947); *Davis v. Woodring*, 111 F.2d 523, 525 (D.C. Cir. 1940), and cases

where courts have refused to review other types of military decisions, *see, e.g.*, *Dist. No. 1, Pac.*

*Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41–42 (D.C. Cir.

2000) (declining to review military's decisions about base closures and realignments given that

"the primary factors driving the . . . decision are national defense, the adequacy of the merchant

marine, foreign policy, and the national interest"); *Orloff v. Willoughby*, 345 U.S. 83, 92 (1953)

(no judicial review of military's duty assignments because "judges are not given the task of

running the Army").

Defendants' reliance on these two lines of caselaw is misplaced.  First, as discussed

further herein, *see infra* Section II.A.1.c (Analysis), there is a critical distinction between a

characterization of service for purposes of discharge—which implicates the "internal

management" of the military, *see Davis*, 111 F.2d at 525—and a characterization of service for

purposes of naturalization, which does not.  Second, unlike *Dist. No. 1* and *Orloff*, this case does

not involve a military decision that affects military operations and thus indisputably requires

military expertise.  Rather, the administrative decision at issue concerns the military's obligation

to certify whether a service member is serving or has served honorably for purpose of

establishing that member's eligibility for naturalization under § 1440.  Moreover, the actual

administrative decision at issue is not DOD's decision as to any individual service member, but

rather its decision to adopt the N-426 Policy and, as part of that policy, to impose Minimum

Service Requirements as a precondition to making any decision as to whether an individual has

served honorably.  Properly described, the administrative decision here is a DOD policy that

interprets an immigration statute, not a decision that requires military expertise or judgment.

30

Nor is the decision similar in any way to the categories of decisions that have previously been recognized as traditionally committed to agency discretion. *See, e.g*., *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (a decision not to institute enforcement proceedings); *Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (a decision by an intelligence agency to terminate an employee in the interest of national security); *Lincoln v. Vigil*, 508 U.S. at 191-92 (the allocation of funds from a lump-sum appropriation). Two recent Supreme Court decisions have confirmed the limited nature of this exception. *See Dep't of Commerce v. New York*, 139 S. Ct. at 2568 ("The taking of the census is not one of those areas traditionally committed to agency discretion."); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. at 1907 ("Because the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA."). As the Court observed in *Kirwa*, "while courts should exercise caution when adjudicating claims involving matters of military affairs and national security, that caution does not give DOD carte blanche authority to act in contravention of . . . applicable statutes." *Kirwa II*, 285 F. Supp. 3d at 265–66. Where, as here, the challenged policy does not in fact "relat[e] to military discipline and military operations," there is no reason to "defer to the judgment of those who must lead our Armed Forces in battle." *North Dakota v. United States*, 495 U.S. 423, 443 (1990) (no deference due to military's interpretation of federal law allocating power between federal and state governments on civilian commercial issues).

Accordingly, the Court concludes that DOD's N-426 Policy is not the type of agency action that is unreviewable because it falls within a category of decisions that have traditionally been committed to agency discretion.

Defendants also argue that the N-426 Policy is unreviewable because 8 U.S.C. § 1440 sets forth "no meaningful standard" by which to judge DOD's determination as to whether a

31

service member "ha[s] served honorably."  (Defs.' SJ Mot. at 16 (quoting 8 U.S.C. § 1440(a)).)

Again, DOD's premise is flawed.  The administrative action at issue is not simply a DOD policy that defines what constitutes honorable service, but a DOD policy that establishes preconditions that a service member must satisfy *before* DOD will even consider whether to certify that the individual has served honorably for purposes of applying for naturalization pursuant to § 1440. As the Court found in *Kirwa*, and as is apparent from the Court's discussion later in this opinion, *see infra* Section II.B (Analysis), the language and structure of § 1440, and the broader statutory scheme for naturalization of which § 1440 is just one part, provide meaningful standards for reviewing that action.  *See Kirwa I*, 285 F. Supp. 3d at 35-38.

Finally, contrary to defendants' arguments, the decisions in *Kotab* and *Kuang* are not persuasive contrary authority.  In *Kuang*, LPR service members brought suit to challenge the LPR Screening/MSSD Policy, which required LPRs to have a completed background investigation before they could ship to basic training.  *Kuang v. U.S. Dep't of Def.*, 340 F. Supp. 3d 873, 890 (N.D. Cal. 2018).  The district court preliminarily enjoined the policy based on the plaintiffs' APA claim that the policy was arbitrary and capricious.  *Id*. at 919, 922.  In reaching its conclusion, the district court rejected the argument that military considerations rendered the policy unreviewable or that the APA claims were foreclosed because the agency action was committed to agency discretion by law.  *Id*. at 895-99, 905-08. The Ninth Circuit reversed, holding that the LPR Screening/MSSD Policy was not subject to arbitrary and capricious review because it did not pass the four-factor *Mindes* test for reviewability of claims against the military.[30]  *See Kuang*, 778 F. App'x at 421 (citing *Mindes v. Seaman*, 453 F.2d 197 (5th Cir.

---

[30] Under the *Mindes* test, "[t]o assess whether a claim against the military is reviewable," a court must consider "(1) the nature and strength of the plaintiffs' claim, (2) the potential injury to the plaintiffs if review is refused, (3) the extent to which review would interfere with military

1971)).  Thus, the Ninth Circuit did not reach the question of whether judicial review would also

have been precluded because the agency action was committed to agency discretion by law—the

issue before this Court.  And, as defendants recognize, the D.C. Circuit has rejected the *Mindes*

test.  (*See* Defs.' SJ  Mot. at 19 n.8.); *see also Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1512

(D.C. Cir. 1989)) ("The *Mindes* court's four factor analysis, which . . . erroneously intertwines

the concept of justiciability with the standards to be applied to the merits of [the] case." (internal

quotation marks omitted)).

    In addition, the policy at issue in *Kuang* is materially different from the N-426 Policy

because the *Kuang* policy concerns when an enlistee can ship to basic training—a quintessential

military decision relating to a DOD personnel matter.  Thus, it is not surprising that the Ninth

Circuit concluded that the LPR Screening/MSSD Policy falls within that category of "military

decisions about national security and personnel [that] are inherently sensitive and generally

reserved to military discretion."  But the same cannot be said of the N-426 Policy, *see supra* pp.

29-31, so the ruling and discussion in *Kuang* provide no reason for this Court to alter its analysis.

    In *Kotab*, the N-426 Policy was at issue, and the district court concluded that it was both

unreviewable under *Mindes* and "committed to agency discretion by law."  The *Mindes* test, as

previously noted, has not been adopted in this Circuit.  As for whether the N-426 Policy is an

agency decision committed to agency discretion by law, the *Kotab* court's concluded that there is

"no meaningful standard to evaluate either *whether* DoD should certify a soldier as having

served honorably or *when* DoD should so certify."  2019 WL 4677020, at *9.  But the court's

explanation of its conclusion is entirely focused on the absence of a standard to judge *whether*

---

functions, and (4) the extent to which military discretion or expertise is involved."  *Kuang*, 778
F. App'x at 421.

DOD should certify that an individual has served honorably. But that is not the critical issue

here—the question is whether there is a meaningful standard by which to judge *when* DOD

should so certify. As explained *supra*, the Court finds a meaningful standard in § 1440, in

conjunction with the entire INA, for reviewing the DOD's decision as to "when" it will

determine whether an individual has, or has not, served honorably.

Accordingly, the Court finds that the N-426 Policy is not that rare agency action that is

unreviewable because it is committed to agency discretion by law.

## II.    PLAINTIFFS' APA CLAIMS

The Court now turns to plaintiffs' challenges to the Minimum Service Requirements

contained in Section I of the N-426 Policy. Plaintiffs claim that the Minimum Service

Requirements violate the APA because they (1) are arbitrary and capricious, *see* 5 U.S.C.

§ 706(2)(A); (2) are contrary to law and in excess of statutory jurisdiction, *see* 5 U.S.C.

§ 706(2)(A), (C); (3) result in agency action unlawfully withheld and unreasonably delayed, *see*

5 U.S.C. § 706(1); and (4) were enacted without notice and comment. *See* 5 U.S.C. § 553; 5

U.S.C. § 706(2)(D).

### A.    Arbitrary and Capricious

An agency rule is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43

(1983). This standard requires an agency to "examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." *Id*. (citation and internal quotation marks omitted); *see also Am. Wild Horse*

34

*Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) ("Th[e arbitrary and capricious]

standard obligates the agency to examine all relevant factors and record evidence, and to

articulate a reasoned explanation for its decision."). The agency's explanation must show "'why

it has exercised its discretion in a given manner'" and "must be 'sufficient to enable [a court] to

conclude that the [agency's action] was the product of reasoned decisionmaking.'" *Owner-

Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203

(D.C. Cir. 2007) (quoting *State Farm*, 463 U.S. at 48, 52).

In addition, when an agency action marks a departure from past practice, "the agency

must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild

Horse Pres. Campaign*, 873 F.3d at 923; *see also Lone Mountain Processing, Inc. v. Sec'y of

Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a

reasoned analysis indicating that prior policies and standards are being deliberately changed, not

casually ignored. Failing to supply such analysis renders the agency's action arbitrary and

capricious." (internal quotation marks and citation omitted)). While the obligation to explain a

change does not require an agency to "always provide a more detailed justification than what

would suffice for a new policy created on a blank slate," the agency must at least "display

awareness that it is changing position" and "show that there are good reasons for the new

policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (citation and

internal quotation marks omitted).

A court's review of an agency action under this standard "is narrow and a court is not to

substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. However, its review

still "must go beyond the agency's procedures to include the substantive reasonableness of its

decision," and in so doing the court must make a "'thorough, probing, in-depth review' to

35

determine if the agency has considered the relevant factors or committed a clear error of

judgment."  *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1098 (D.C. Cir. 1996)

(quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)).

Plaintiffs claim that the N-426 Policy is arbitrary and capricious because defendants

failed to explain the change from "DoD's longstanding practice of certifying honorable service

based solely on whether non-citizens have served honorably at the time DoD completes their N-

426" to the Minimum Service Requirements, which contain both a durational component and an

active duty component.  (Pls.' SJ Mot. at 23.)  Defendants contest (1) plaintiffs' view of DOD's

prior practice and (2) plaintiffs' claim that defendants have failed to provide a reasoned

explanation for the N-426 Policy.  (Defs.' SJ Mot. at 27-29; *see also* Defs.' SJ Reply at 15-17.)

### 1.    Prior Practice regarding N-426 Certification for LPRs and MAVNIs

The Court must first track defendants' past practice of certifying N-426s for noncitizen

enlistees.  As detailed below, this practice evolved starting with amendments made to § 1440.

#### a.    1968-1970

The 1968 amendment to § 1440 was passed "to provide for the expeditious naturalization

of aliens who have served in an active-duty status in the Armed Forces of the United States

during the Vietnam hostilities or during any other [future designated period of hostility]."  S.

Rep. No. 90-1292, at 2 (1968) (Pls.' SJ Mot. Ex. 3, ECF No. 4-4).  The Senate Judiciary

Committee Report on that amendment states that, under § 1440, "an alien or noncitizen national

who has served honorably . . . may be naturalized *without regard to . . . a waiting period*. . . .

[T]he peacetime serviceman must have a minimum of 3 years' service[;] the wartime serviceman

has *no minimum required*."  *Id*. at 4-5 (emphasis added).

Consistent with this goal of expedited citizenship, in 1970 DOD established regulations and guidance that applied to "an alien who serves honorably on active duty in the Armed Forces of the United States" during a designated period of hostility and required that:

> each qualifying alien shall be advised of the liberalized naturalization provisions of [§ 1440], i.e., that the usual naturalization requirements concerning age, residence, physical presence, court jurisdiction and *waiting periods are not applicable*, and will be given appropriate assistance in processing his naturalization application . . . .

32 C.F.R. 94.4(b)(2) (emphasis added); DOD Directive 5500.14, at 4.2.1, 4.2.2. Both provisions also required that "[m]ilitary basic training and orientation programs will include advice and assistance to interested aliens in completing and submitting the application and other forms required to initiate naturalization proceedings." 32 C.F.R. 94.4(b)(2)(i); DOD Directive 5500.14, at 4.2.2.1. Thus, as early as 1970, DOD understood § 1440 to establish no minimum time-in-service for eligibility to naturalize, and DOD was committed to assisting noncitizen enlistees in completing and submitting their naturalization applications while at basic training.[31]

### b.    2003-2016

In 2003, Congress again broadened the group of noncitizen service members who could benefit from the INA's expedited naturalization provisions. First, Congress shortened the time-in-service requirement of § 1439 from three years to one year. 117 Stat. 1691. Second, Congress extended the benefit of § 1440 to anyone "serv[ing] honorably as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status." 8 U.S.C. § 1440(a) (emphasis added); *see also* 117 Stat. 1693. According to the Congressional Record relating to the 2003 amendment, Senator Kennedy, the co-sponsor of the legislation, stated:

> Being a member of the Selected Reserves is nothing less than a continuing

---

[31] Both provisions are still in effect today, although the DOD Directive was canceled and reissued as the DODI in 2006. *See* DODI 5500.14, at 1.

commitment to meet very demanding standards, and they deserve recognition for
their bravery and sacrifice.  The amendment allows permanent resident members
of the Selected Reserves to expedite their naturalization applications during war
or military hostilities.

149 Cong. Rec. S7,280–83 (daily ed. June 4, 2003).  Senator Chambliss echoed this sentiment:

[T]he amendment provides a process of immediate naturalization for our selected
reserve Armed Forces serving during a time of hostility.  In today's military, we
rely heavily and strategically on our reservists, and it is only fair to extend this
benefit to reserve as well as active duty personnel serving our country in a time of
war.

*Id.* at S7,283.  Finally, Senator Brownback stated:

[T]he amendment remembers those courageous men and women who ensure that
in times of war or hostility, our country is ready and our recruiting needs are met,
by saying that members of the Reserves or National Guard will have expedited
naturalization during times of war or hostile military operations.

*Id.*  Thus, beginning in 2003, § 1440 offered the same path to expedited naturalization to both

LPR Reservists and LPRs serving in an Active Component.[32]

USCIS understood this amendment to "extend[] the benefit of" "eligibil[ity] for

naturalization without having served for any particular length of time" "not only to individuals

who served honorably in an active duty status during specified periods of hostilities, but also to

individuals who have served honorably as members of the Selected Reserve of the Ready

Reserve of the U.S. Armed Forces during such periods of hostilities."  Naturalization of Certain

Persons in the U.S. Armed Forces, 75 Fed. Reg. 2,785, 2,785 (Jan. 19, 2010) (codified at 8

C.F.R. Parts 328 and 329).  Accordingly, since 2010, USCIS regulations have provided that

[t]o be eligible for naturalization under [§ 1440], an applicant must establish that
he or she . . . [h]as served honorably in the Armed Forces of the United States as a
member of the Selected Reserve of the Ready Reserve or in an active duty status
in the Armed Forces of the United States during [a designated period of
hostilities].

---

[32] Because the MAVNI Program was not authorized until 2008, § 1440 applied only to LPRs.

38

8 C.F.R. 329.2(a).

The USCIS Policy Manual, first published in 2013, provided more detailed guidance on the prerequisites for naturalization under § 1440. The Manual stated that "'[o]ne day of qualifying service [wa]s sufficient in establishing eligibility.'"[33] *Nio II*, 385 F. Supp. 3d at 50 (quoting USCIS Policy Manual, Vol. 12, Part I, Ch. 3, § A); (*see also* Pls.' SJ Mot Ex. 6, at 1, ECF No. 4-7 (2017 version).) The Manual further defined "qualifying service" as "honorable service in the Selected Reserve of the Ready Reserve or active duty service in the U.S. Army, Navy, Marine Corps, Air Force, or Coast Guard." *Id.* Thus, USCIS considered one day of service in either an Active Component or one day of drilling as a Reservist to qualify a service member for naturalization under § 1440.

At least two manuals from military branches mirror this guidance. First, from at least 2005 until 2017, "The Soldier's Guide to Citizenship Application," an Army document used to assist noncitizen enlistees in completing their naturalization applications, defined "honorable service" for purposes of certifying an N-426 as follows:

> As a general rule, a Soldier is considered to be serving honorably unless a decision has been made, either by the Soldier's commander or a court martial, to discharge him/her under less than honorable conditions.
>
> In the rare cases where the character of a Soldier's service is questionable, ONLY the Soldier's commander can decide this issue, and the sole criterion for the decision is: If the Soldier were being discharged today, based on his/her record, what type of discharge would the Soldier receive? If Honorable or General or Under Honorable Conditions, the character of service on the N-426 will read "honorable." If Under Less than Honorable Conditions, the N-426 character of service item will NOT read "honorable."

---

[33] This language was deleted from the USCIS Policy Manual by sometime in 2019. *See* USCIS Policy Manual, Vol. 12, Part I, Ch. 3, § A (2019).

(Pls.' SJ Mot. Ex. 8, at 11, ECF No. 4-9 (2017 version); Pls.' SJ Mot. Ex. 9, at 11, ECF No. 4-10

(2011 version); Pls.' SJ Mot. Ex 12, at 10, ECF No. 4-11 (2005 version).)  Second, a Navy

Personnel Manual dated March 14, 2008, provided, "Only *1 day* of service is required during

these periods [of hostility]" to qualify for naturalization under § 1440.  (Pls.' SJ Mot. Ex. 13, at

2, ECF No. 4-14.)

      Further, DODI 5500.14 provides:

> Under the provisions of Section 1440 . . . an alien *who serves honorably as a member of the Selected Reserve of the Ready Reserves or on active duty* in the Armed Forces of the United States during any [designated period of hostilities], and who is otherwise eligible, may be naturalized whether or not the member has been lawfully admitted to the United States for permanent residence . . . .

DODI 5500.14, at E2.2.1 (emphasis added).

      In practice during this time, USCIS and the military cooperated to assist noncitizen

enlistees in obtaining their certified N-426s and submitting their naturalization applications upon

arrival at basic training.  *Nio I*, 270 F. Supp. 3d at 55–56.  USCIS would adjudicate the

applications and naturalize the enlistees before the end of basic training, which was typically ten

weeks.  *Id.*[34]

        **c.**     **2017**

      In late 2016, the landscape began to change.  Due to delays in shipping to basic training

caused by the new security screening requirements set forth in the September 30, 2016 DOD

Memorandum, by mid-2017, approximately 500 MAVNI Reservists drilling in the DTP had

sought and had received certified N-426s based only on service in at least one day of drilling.

*Nio II*, 385 F. Supp. 3d at 53.  "However, sometime in the spring of 2017, the Army began to

---

[34] While the Court in *Nio* was concerned only with MAVNI enlistees, this process applied equally to other noncitizen enlistees.  *See Nio I*, 270 F. Supp. 3d at 55 n.11; USCIS Fact Sheet at 2.

change its practice and began to decline requests for N–426s to MAVNIs still in the DTP on the ground that they were not serving on 'active duty.'" *Kirwa I*, 285 F. Supp. 3d at 32.  By July of that year, DOD stopped certifying any new N-426s for MAVNI Reservists "because it 'viewed IET [active duty] as a necessary precondition of an honorable service determination,'" *id.* (quoting 7/7/17 Miller Decl. ¶ ¶ 19–20; 7/28/17 Miller Decl. at 6 (AR 34)) (alteration in original), and on August 17, 2017, the Army placed a formal hold on the issuance of any new N-426s to those who had not yet served on "active duty," pending development of criteria for issuing N-426s in the future.  *Id.*; *see also Nio I*, 270 F. Supp. 3d at 59–60.  This new active-duty requirement prompted the filing of the *Kirwa* lawsuit.  *Kirwa I*, 285 F. Supp. 3d at 34.

On October 13, 2017, DOD issued the N-426 Policy that plaintiffs challenge in this case. In the N-426 Policy, DOD retreated from its position that Reservists who enlisted prior to October 13, 2017 (the *Kirwa* plaintiffs) were required to serve on "active duty" to receive a certified N-426.  (AR 8.)  However, the Policy imposed such a requirement on those who enlisted after October 13, 2017 (the plaintiffs in this case).  (AR 7.)

Based on the record before the Court, no durational or active-duty requirement existed prior to the October 13, 2017 N-426 Policy.  Instead, at least as early as 2003, if not earlier, DOD certified an N-426 based on the service member's record at the time he submitted the form, and there were no durational requirements for MAVNIS or LPRs, nor were there any active-duty requirements for MAVNI or LPR Reservists.  While the Court lacks the same empirical data[35] for LPRs in this case that it had for MAVNIs in *Nio* and *Kirwa*, the statutes, regulations, and policy manuals, and the Form N-426 treat LPRs and MAVNIs the same.  Thus, it is reasonable to

---

[35] In *Nio*, the Court had evidence that 500 MAVNIs had N-426s after one day of drilling.  *See* Pls.' Mot. for Prelim. Inj. Ex. 8, *Nio*, ECF No. 17-8 (May 19, 2017 DOD "Action Memo"); Pls' App'x for Summ. J at 7, Nio, ECF No. 216-2 (Index); *Nio*, 385 F. Supp. 3d at 52.

41

infer that DOD's prior N-426 practice as applied to MAVNIs is indicative of DOD's practice as applied to LPRs. And, at least as early as 2008, one day of service was sufficient in the Navy to obtain an N-426, and USCIS, which was tasked with the job of implementing § 1440(a), only needed one day of service in an Active Component or one day of drilling by a Reservist to qualify for an N-426 and naturalization.

This conclusion is confirmed by two DOD documents, each circulated weeks before the N-426 Policy was adopted. First, a DOD Info Memo dated September 22, 2017, "Military Accessions Vital to the National Interest (MAVNI) Pilot Program Update," recommends "establish[ing] a new policy that *any non-citizen enlistee* complete basic training to include 180 days of active honorable service, or one year of Reserve weekend drills and annual training, in order to qualify for a certification of citizenship eligibility (*in contrast to the current practice of certifying eligibility after one day of service*)." (AR 28 (emphasis added).) Second, "Policy Changes Concerning Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program," issued on the eve of the N-426 Policy, explains that the October 13 N-426 Policy "is a change from the current practice of certification of honorable service for the purpose of expedited naturalization after 'one day of service.'" (AR 17, 20.) Defendants admit that this past practice existed. (*See* Hr'g Tr. at 50-51, July 16, 2020, ECF No. 37 ("7/16/20 Tr.") ("MR. SWINTON: . . . [T]he information that the Court has is correct with regards to the military's more recent practice")), but they contest that it was "longstanding." (*Id.* (describing the practice as "short-term").) Defendants argue, instead, that DOD's "longstanding practice" (7/16/20 Tr. at 50) was to "require[] a substantial record of service when evaluating whether service is honorable," and the N-426 Policy "returned DoD's process for making

42

honorable service determinations to what had previously existed." (Defs.' SJ Mot. at 28.)

Defendants' argument fails for two reasons.

First, as discussed above, at least from 1968 until 2017, there were no active-duty requirements or durational requirements for Reservists or any durational requirements for either MAVNIs or LPRs in active-duty components. Further, we know from the USCIS Policy Manual that at least by 2013, the USCIS considered, for purposes of naturalization, that one day of active duty or one day of drilling for Reservists was sufficient to qualify for an N-426. This history is sufficient to trigger defendants' obligation to acknowledge and explain any departure from that practice.

Second, the only evidence cited by defendants to support their proposition that "[t]he military . . . has always required a substantial record of service when evaluating whether service is honorable" relates to characterization of *discharge*, not characterization of service for purposes of naturalization. For instance, defendants' two cases from the 1940s involved plaintiffs who had received uncharacterized discharges from the draft and who sought declaratory judgments that they were entitled to honorable discharges. *Patterson*, 329 U.S. at 540-41, and *Davis*, 111 F.2d at 523–24. In both cases, the Supreme Court and the D.C. Circuit, respectively, upheld the plaintiffs' uncharacterized discharges as in accordance with War Department regulations providing that men who were drafted but discharged at their mobilization camps before being "finally accepted for military service" were to receive uncharacterized discharges. *Patterson*, 329 U.S. at 542–44; *see also Davis*, 111 F.2d at 525. Neither case relates to or discusses characterization of service for purposes of naturalization, nor does either case hold, as defendants claim, "that the military needs a sufficient amount of time in order to make an honorable service characterization determination." (7/16/20 Tr. at 29.) Instead, both Courts deferred to the War

43

Department's policy governing discharges, which, unlike naturalization, is squarely within the province of the military. *See supra* Section I (Analysis). Moreover, in the only case cited by the parties involving naturalization at this time, a federal court held that the petitioner could naturalize regardless of the amount of time he served because the Nationality Act of 1942—the predecessor to § 1440—"establishe[d] no prerequisites as to duration of service." *Petition of Delgado*, 57 F. Supp. 460, 461 (N.D. Cal. 1944).

The remainder of defendants' evidence—former regulations and DODI 1332.14—also deals exclusively with the characterization of discharge. The former regulations, in their original iteration, provided that "[i]ssuance of an *Honorable Discharge* will be conditioned upon proper military behavior and proficient performance of duty with due consideration for the member's age, *length of service*, grade, and general aptitude." 31 Fed. Reg. 705, 706 (Jan. 19, 1966) (codified at 32 C.F.R. Part 41) (emphasis added). These regulations were later amended to establish an "entry level status," which was held by a service member during "[t]he first 180 days of continuous active military service" or, for a Reservist, the first "180 days after beginning an initial period of entry level active duty training." 47 Fed. Reg. 10,162, 10,175 (Mar. 9, 1982). A service member discharged during that time received an Entry Level Separation, or an uncharacterized discharge. *Id.* at 10,183. "[E]xcept in combat operations or other special circumstances," a service member was only eligible to receive an honorable discharge after advancing out of entry level status. *Id.* at 10,171. The substance of these regulations was removed from the C.F.R. in 1998 and is currently maintained in the DODI. *See* DODI 1332.14, *Enlisted Administrative Separations*, Encl. 4, § 3c(1)(a) (providing that any service member separated while in "entry-level status" will receive an uncharacterized discharge). While the former regulations and current DODI support the notion that length of service has been a

44

consideration in characterizing a discharge, defendants fail to show that these standards have ever been applied to or are relevant to an N-426 certification.[36] The only evidence of past practice with regard to this specific type of service certification, therefore, shows that, long before October 13, 2017, DOD certified service on an N-426 based on the service member's record at the time he or she submitted it, and that the enlistee could obtain an N-426 after one day of active duty or one day of drilling, in the case of a Reservist.

### 2. DOD's Explanation

Defendants claim that the Minimum Service Requirements were "included in the [N-426 Policy] to align DoD's honorable service characterizations with how DoD defines honorable service more broadly." (Defs.' SJ Mot. at 27.) Defendants attempt to support this claim with the declaration of Stephanie P. Miller[37] (Defs.' SJ Mot. Ex. 1, ECF No. 19-2 ("05/22/20 Miller Decl.")), and a two-page document titled "Army Input on Certification o[f] Military or Naval Service in an Active Duty Status for the Purpose of Naturalization." (AR 41–42.) This document was provided by the Army after a July 2017 meeting involving USD(P&R), the Army, the Navy, and the Air Force, where attendees discussed "developing a policy to require that . . . members serve for a defined period of time before DoD makes an honorable service determination." (05/22/20 Miller Decl. ¶ 7.) In it, the Army "recommend[s] that any

---

[36] Although standards for discharge were not applied to an N-426 certification prior to October 13, 2017, DOD's discharge practice has had a serious impact on a noncitizen's ability to naturalize. Pursuant to the September 30, 2016 DOD Memorandum, a soldier cannot ship to basic training unless his MSSD is completed. If a soldier receives a negative MSSD, "he or she is discharged promptly, and the discharge will be 'uncharacterized' by virtue of the soldier's entry-level status." *Nio II*, 385 F. Supp. 3d at 64. According to USCIS's policy, an uncharacterized discharge automatically disqualifies a discharged soldier from naturalizing under § 1440 because it is not an honorable discharge. *Id.*

[37] Stephanie P. Miller is the Director of the Accession Policy Directorate in the Office of the Under Secretary of Defense for Personnel and Readiness. (05/22/20 Miller Decl. ¶ 1.)

45

prospective requirements concerning length of service be tied to commonly used personnel policies concerning characterization of service" and "suggest[s] using the same standard that we use for giving someone an honorable discharge."  (AR 41 (citing DODI 1332.14).)

The administrative record paints a different narrative.  Two DOD memoranda prepared during the design of the N-426 Policy strongly suggest that the Minimum Service Requirements were included to address national security concerns raised by the inclusion of noncitizens in the military.  The first, the September 22, 2017 DOD Info Memo titled "Military Accessions Vital to the National Interest (MAVNI) Pilot Program Update," describes ongoing and recommended efforts to mitigate the "counterintelligence . . . risk" presented by MAVNIs and LPR enlistees. (*See* AR 27–28 ("LPR recruits . . . share[] many of the same risk factors with the MAVNI population.").)  "[T]o address ongoing mitigation efforts," the document recommends what would become the Minimum Service Requirements—that DOD "establish a new policy that any non-citizen enlistee complete basic training to include 180 days of active honorable service, or one year of Reserve weekend drills and annual training, in order to qualify for a certification of citizenship eligibility."  (AR 28.)  The second memorandum, "Policy Changes Concerning Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program," was disseminated the day before the N-426 Policy was issued in order to further "[t]ransparency with all audiences regarding policy changes affecting DoD foreign nationals," to "[e]nsure those affected understand the reasoning and importance of the changes," and to put forth "[a]ccurate information in the public domain."  (AR 15.)  In explaining the changes made by the N-426 Policy, the document states:

> In the case of non-citizen applicants for military service, due to security, counterintelligence, and insider threat concerns, it is the Department's intent to ensure all appropriate security screening is complete prior to the individual's entry into military service and a certification of honorable service is granted for

46

purposes of expedited naturalization.

> As such, effective immediately, in order for a foreign national serving in the Active, Reserve, or Guard Service to receive a certification of honorable service for the purposes of expedited naturalization (citizenship), he or she must:
>
> . . .
>
> Complete at least 180 consecutive days of active duty service, or a [sic] least one year of satisfactory service in the Selected Reserve.

(AR 20.)  Thus, both documents tie the Minimum Service Requirements to national security concerns.

This explanation tracks the one defendants gave for the N-426 Policy's background investigation and suitability vetting requirements in *Kirwa*.  *Kirwa I*, 285 F. Supp. 3d at 39 ("In an attempt to explain the change, defendants' counsel repeated the now-familiar-refrain that DOD has made the change for 'national security' purposes."); (Hr'g Tr. at 32, *Kirwa*, Oct. 18, 2017, ECF No. 27 ("10/18/17 *Kirwa* Tr.") ("National security concerns . . . has [sic] necessitated these policy changes.")).  The Court rejected this rationale—"national security issues *may* justify enhanced security screening, . . . but N-426 certification is not related to that process.  . . . Therefore, DOD has given no reasoned justification why certifying a form N-426 for immigration and naturalization purposes implicates our national security."  *Kirwa I*, 285 F. Supp. 3d at 39.  DOD then shifted its rationale in that case, asserting that the N-426 Policy "reflects DoD's desire to establish, for the first time, a clear and consistent process for N-426 certifications following a number of years in which the military was applying inconsistent standards for such determinations."  *Kirwa II*, 285 F. Supp. 3d at 269.  The Court also rejected this rationale because it found "no support in the administrative record."  *Id.*

In this case, defendants disavow the national security rationale as it relates to the Minimum Service Requirements and suggest that its mention in these documents relates to other

47

policies put in place on October 13, 2017.  (7/16/20 Tr. at 52.)  But neither of the

abovementioned pre-October 13, 2017 memoranda, which purport to explain the Minimum

Service Requirements, mention aligning N-426 practice with DOD's discharge practice.

Moreover, the Reservist Minimum Service Requirement does not align with DOD's

discharge practice.  Pursuant to DODI 1332.14, a Reservist graduates from entry-level status

after 180 days of continuous active-duty training or, if his training is split, ninety days after

beginning his second period of active-duty training.  The Reservist Minimum Service

Requirement, however, requires that a Reservist serve for a year, including 180 days of active-

duty service, before he or she is eligible to receive a certified N-426.  Also, defendants assert that

the longer time-in-service required by the N-426 Policy for Reservists was due to "an awareness

by DoD that such service members serve in an active-duty capacity less frequently and thus build

their service record at a slower rate."  (Defs.' SJ Mot. at 28.)  But this explanation finds no

support in the record.

Nor does the explanation given by defendants "connect[] the facts found and the choice

made."  *State Farm*, 463 U.S. at 43.  Defendants' explanation suggests that the standards

pertaining to an individual's suitability for military service are coextensive with those governing

eligibility to naturalize.  While a fuller military record may be necessary to determine whether

someone is suitable to serve in the military, defendants have not explained why it is necessary

for eligibility to naturalize.  Since the ability to perform in the military does not equate with good

moral character for purposes citizenship, USCIS makes an independent judgment as to whether

an individual qualifies for the latter.  Specifically, USCIS is required to "conduct examinations"

of all applicants.  8 U.S.C. § 1446(b); *see also* 8 C.F.R. § 332.1(a) (designating USCIS officers

"to conduct the examination for naturalization required under" the INA).  Pursuant to USCIS

48

regulations, this includes a review of FBI criminal background checks.  *See* 8 C.F.R. § 335.2(b).

When adjudicating naturalization applications of service members, USCIS also requests from

DOD name check queries of DOD's Defense Clearance Investigative Index to see if the

applicant has a criminal record on his or her military record.  *See* USCIS Policy Manual, Vol. 12,

Part I, Ch. 6, § A.  After these checks, an applicant is interviewed by a USCIS officer.  *See* 8

C.F.R. § 335.2.

USCIS will not approve a naturalization application unless the agency determines that the

applicant is "a person of good moral character, attached to the principles of the Constitution of

the United States, and well disposed to the good order and happiness of the United States."  8

U.S.C. § 1427(a). The applicant "bears the burden of demonstrating that, during the statutorily

prescribed period, he or she has been and continues to be a person of good moral character," 8

C.F.R. § 316.10(a)(1), and USCIS makes this determination "on a case-by-case basis."  8 C.F.R.

§ 316.10(a)(2).  While certain designated criminal and immoral acts are automatically

disqualifying, USCIS otherwise has discretion to evaluate the applicant's character.  *Id.*

In *Nio*, defendants acknowledged that certain considerations made in the military

suitability context, such as "behavior that could make an individual vulnerable to coercion in the

context of handling classified information . . . may be less relevant to a USCIS assessment of the

individual's moral character."  *Nio II*, 385 F. Supp. 3d at 65 (citation and internal quotation

marks omitted).  Similarly, "in rendering an assessment [of military suitability], any doubts 'will

be resolved in favor of the national security.'  By contrast, in assessing good moral character

USCIS has discretion to evaluate the applicant's character in the context of 'the standards of the

average citizen in the community of residence.'"  *Id.* (quoting DOD Memorandum:

49

Implementation of Adjudicative Guidelines for Determining Eligibility for Access to Classified

Information (Dec. 29, 2005), Aug. 30, 2016, and 8 C.F.R. § 316.10(a)(2), respectively).

Moreover, Ms. Miller explained in another case that at least some individuals being found

"unsuitable" for military service should still eligible to naturalize under USCIS's requirements:

> When we screen someone for the purpose of suitability and security, we're screening at a fairly high threshold. So an individual who may have a known or unknown relative that works for a foreign defense department or foreign intelligence agency, the individual themselves may have no malicious intent towards the United States or to the government; but we cannot mitigate the fact that they have a direct relative working for a foreign intelligence agency. So, therefore, the individual may not be suitable to hold a national security position [*i.e.*, to serve as a soldier].
>
> But ultimately that may not mean that the individual is not suitable to ultimately become a United States citizen. And we have tried very hard to make that distinguishing factor with our colleagues at Department of Homeland Security and USCIS. So they may not be able to serve [or continue serving] in the military, but that may not bear on [USCIS's] final determination as to whether that individual should be naturalized.

(Pls.' Notice Ex. 8, , *Nio*, Mar. 24, 2019, ECF No. 244-8 (trial testimony in *Tiwari v. Mattis*, No.

C17-00242 (W.D. Wash.)) (alterations in original).)[38]

In establishing the Minimum Service Requirements, defendants have also "failed to

consider . . . important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including the fact

that the Reservist Minimum Service Requirement has the practical effect of requiring Reservists

to serve the same amount of time to be eligible to naturalize under both § 1440 and § 1439.

Section 1439 requires noncitizens serving in times of peace to serve a minimum of one year

before becoming eligible to naturalize. 8 U.S.C. § 1439(a). This one-year minimum may be

---

[38] In *Tiwari*, a district court held that naturalized citizens who had enlisted through the MAVNI program had been unconstitutionally discriminated against on the basis of national origin because the government had subjected them to NIAC checks and continuous monitoring for national security concerns, even after becoming citizens. *See Tiwari v. Mattis*, 363 F. Supp. 3d 1154 (W.D. Wash. 2019).

satisfied by "a combination of active duty and inactive duty in a Reserve Status." DODI

5500.14, at E2.1.2; 32 C.F.R. 94.4(a)(2). Section 1440, on the other hand, was intended to

provide an expedited path for those serving during periods of hostility. Unlike § 1439, there is

no duration of service requirement in § 1440. However, the N-426 Policy imposes such a

requirement, thereby effectively requiring Reservists to serve the same amount of time in both

peacetime and wartime and erasing the benefit of § 1440 for Reservists.

In sum, defendants' purported explanation is not reflected in the administrative record,

does not "connect[] the facts found and the choice made," and does not "consider . . . important

aspect[s] of the problem." *State Farm*, 463 U.S. at 43. While the Court's review may be

circumscribed, the APA clearly requires more of an agency. Accordingly, the Court will grant

summary judgment to plaintiffs on their claim that the Minimum Service Requirements are

arbitrary and capricious.

### B.     Contrary to Law & Agency Action Unlawfully Withheld

Plaintiffs claim that the Minimum Service Requirements violate 5 U.S.C. § 706(2)(A)

and (C), which instruct a reviewing court to "hold unlawful and set aside agency action . . . not in

accordance with the law," § 706(2)(A), or "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right," § 706(2)(C).[39] The crux of plaintiffs' claim is that the

Minimum Service Requirements substantively amend the naturalization requirements set forth in

§ 1440. Plaintiffs also assert that defendants' refusal to certify plaintiffs' N-426s because they

have not met a Minimum Service Requirement violates 5 U.S.C. § 706(1), which directs a court

---

[39] These claims are essentially the same because "there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has." *City of Arlington v. F.C.C.*, 569 U.S. 290, 299 (2013).

51

to "compel agency action unlawfully withheld." To show that DOD has unlawfully withheld plaintiffs' honorable service certifications, plaintiffs must prove that DOD "failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The required action "must be 'ministerial or nondiscretionary' and must amount to 'a specific, unequivocal command.'" *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018) (quoting *Norton*, 542 U.S. at 63–64). Plaintiffs argue that § 1440 commands such action from DOD.

Because both plaintiffs' claim under 5 U.S.C. § 706(2)(A) and (C) and their claim under 5 U.S.C. § 706(1) require the Court to interpret § 1440, the Court will consider the two together. *See Kirwa II*, 285 F. Supp. 3d. at 268 n.9 (plaintiffs' contrary-to-law and unreasonable delay claims survived a motion to dismiss for the same reasons). In doing so, the Court will employ "the traditional tools of statutory construction . . . include[ing] examination of the statute's text, legislative history, and structure, as well as its purpose." *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012).

### 1. Purpose and Statutory Text

Section 1440 was enacted "to provide for the expeditious naturalization" of noncitizens serving in the military during designated periods of hostility. S. Rep. No. 1292, at 2. To that end, the statute states, in relevant part:

> Any person who, while an alien or a noncitizen national of the United States, has served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the military, air, or naval forces of the United States during [a designated period of hostility], and who, if separated from such service, was separated under honorable conditions, may be naturalized as provided in this section . . . . The executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions . . . .

52

8 U.S.C. § 1440(a).  Defendants argue that, because the INA does not define what it means to have "served honorably," Congress delegated the interpretation of that term to DOD, and the Court should thus defer to DOD's interpretation as set forth in the N-426 Policy.  (Defs.' SJ Mot. at 33, 38.)  Defendants' argument is unpersuasive.

Section 1440 is a naturalization statute, and "[t]he sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General."  8 U.S.C. § 1421(a).  The Attorney General, in turn, has delegated this power to USCIS, not DOD.  8 C.F.R. § 310.  While the statute contemplates a role for DOD, that role is limited to certifying an enlistee's honorable service, not rewriting the statute to establish new standards for naturalization.

That defendants are not authorized to establish naturalization standards under § 1440 is bolstered by USCIS's understanding of DOD's role in the naturalization process, as indicated by the format of Form N-426 as it existed at least beginning in 2013 through 2019.[40]  (*See* Pls.' PI Mot. Ex. 4, *Kirwa*, ECF No. 11-4 (Form N-426 that expired on August 31, 2019) ("2019 N-426")); Pls.' PI Mot. Ex. 3, *Kirwa*, ECF No. 11-3 (Form N-426 that expired on August 31, 2017) ("2017 N-426"); USCIS Form N-426 (Form N-426 that expired April 30, 2015) ("2015 N-426").  The form first required the applicant-enlistee to provide personal information and all periods of military service, by branch, dates of service, and "type of service"—either "Active Duty" or "Selected Reserve of the Ready Reserve."  2019 N-426 at 1–3; 2017 N-426 at 1–3; 2015 N-426 at 1.  For applicants who are currently serving, the form required the certifying official to simply check "Yes" or "No" as to whether the enlistee is serving or has served honorably.  2019 N-426 at 3; 2017 N-426 at 3; 2015 N-426 at 1.  If the answer is "No," the certifying official was

---

[40] The forms used between 2013 and 2019 are "essentially the same."  *Kirwa I*, 285 F. Supp. 3d at 27 n.7.

directed to provide details in the "Remarks" section, specifically to "[p]rovide any derogatory information in your records relating to the service member's character, loyalty to the United States, disciplinary action, convictions, other than honorable discharges, or other matters concerning his or her fitness for citizenship." 2019 N-426 at 3–4; 2017 N-426 at 3–4; *see also* 2015 N-426 at 1. The form required nothing more of DOD.

Thus, defendants are not entitled to deference in their interpretation of § 1440. *See DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013) ("Justifications for deference begin to fall when an agency interprets a statute administered by multiple agencies."); *see also Kirwa II*, 285 F. Supp. 3d 267 n.8 ("*Chevron* deference would not be applicable given the lack of evidence that Congress delegated authority to DOD to interpret immigration statutes and the informal manner in which DOD reached its October 13th Guidance.").

### 2.    Structure

Moreover, while § 1440 does not explicitly define what it means to have "served honorably," the language of § 1440, other parts of the INA and the statute's legislative history indicate the term's meaning. As recognized in *Kirwa*, "[e]very characterization of honorable service or separation under honorable conditions in 8 U.S.C. § 1440 is defined in terms of *past service*." *Kirwa II*, 285 F. Supp. 3d at 267 (emphasis added). The statute applies to "[a]ny person who . . . *has served* honorably," and DOD's role under the statute is confined to "determin[ing] whether persons *have served* honorably." 8 U.S.C. § 1440(a) (emphasis added). References to honorable service or separation under honorable conditions in subsections (b) and (c) are likewise stated in the past tense. Thus, § 1440 "specifically refers to *past service*, not to DOD's possible future suitability determinations," *Kirwa I*, 285 F. Supp. 3d at 36, and, through the time-in-service requirements contained in the Minimum Service Requirements, "defendants

54

are impermissibly conflating a present suitability determination with a determination of past

honorable service." *Kirwa II*, 285 F. Supp. 3d at 267-68.

The problem identified by defendants—that certifying N-426s only on past service

equates to certifying honorable service "on the basis of a barebones record associated with a

brief period of service" (Defs.' SJ Mot. at 34)—is resolved by another subsection of § 1440.

Under subsection (c),

> [c]itizenship granted pursuant to this section may be revoked . . . if the person is
> separated from the Armed Forces under other than honorable conditions before
> the person has served honorably for a period or periods aggregating five years.

Thus, § 1440 contains an implicit requirement that an individual serve honorably for at least five

years to maintain U.S. citizenship. Immediate eligibility to apply for citizenship in subsection

(a) is compatible with subsection (c)'s safeguard.

That § 1440 contains no minimum service requirement is confirmed by the text of

§ 1440's companion, § 1439, which provides an expedited path to naturalization for military

service during peacetime. Both sections were enacted on the same date, but Congress limited the

benefit of § 1439 to "person[s] who ha[ve] served honorably at any time in the armed forces of

the United States *for a period or periods aggregating one year*." 8 U.S.C. § 1439(a) (emphasis

added). By contrast, Congress did not include a minimum time-in-service requirement in

§ 1440. The inclusion of a time-in-service requirement in § 1439 shows that Congress knows

how to establish such a requirement when it wants to, and the lack of a time-in-service

requirement in § 1440 suggests that Congress did not intend for one to apply there. *See Council

for Urological Interests v. Burwell*, 790 F.3d 212, 221 (D.C. Cir. 2015) (inclusion of language in

one statutory exception and omission of the same language in another "suggest[s] that the

omission in this particular context was deliberate"); *Hedrick v. Novastar Mortg., Inc. (In re*

*Hedrick*), 524 F.3d 1175, 1187 (11th Cir. 2008) ("Where Congress knows how to say something but chooses not to, its silence is controlling."); *New York State Bar Ass'n v. F.T.C.*, 276 F. Supp. 2d 110, 135 (D.D.C. 2003) (collecting cases that "have found that when Congress legislates in one area with explicit reference in a statute on an area of concern, but fails to reference that same subject matter in another statute, its silence is evidence that Congress did not intend for there to be applicability in the latter statute").

### 3. Legislative History

Defendants argue that Congress's silence as to time-in-service in § 1440, when contrasted with the time-in-service requirement of § 1439, "indicat[es] that Congress left it to DoD to construe the phrase 'honorable service'" in § 1440. (Defs.' SJ Mot. at 18.) But defendants' reading is contrary to § 1440's legislative history, which is ripe with evidence that Congress intended that there be no minimum time-in-service required of a noncitizen enlistee in order to benefit from § 1440. *Burns v. United States*, 501 U.S. 129, 136, (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."). In 1940, the INA's predecessor, the Nationality Act, established the first expedited path to citizenship for noncitizen service members, as long as they "ha[d] served honorably at any time . . . for a period or periods aggregating three years." 54 Stat. 1149–50. Two years later, Congress amended the NA to remove the three-year service requirement for those who had served or were serving honorably in World War II. 56 Stat. 182. The meaning of this change was discussed by Representative A. Leonard Allen and Dr. Henry B. Hazard, Assistant to the Commissioner of the Immigration and Naturalization Service (USCIS's predecessor), at a hearing before the Immigration and Naturalization Committee:

Mr. Allen: Does this bill simply make it mandatory that any one who joins the

army immediately gets citizenship[?]

Mr. Hazard:  Not at all, sir.  His service must be honorable.

Mr. Allen:  How long must he render service?

Mr. Hazard:  *No particular period of time.*

*Naturalization of Aliens Serving in the Armed Forces of the U.S.: Hearing on H.R. 6073, H.R. 6416, and H. R. 6439 before the H. Comm. On Immigration and Naturalization*, 77th Cong. 12 (1942) (emphasis added).  Representative Noah Mason confirmed that, under the amendment, a noncitizen service member "immediately . . . becomes eligible to make [a naturalization] application." *Id.* at 14.

Defendants argue that this legislative history "evidences Congressional intent to vest discretion in DoD when making honorable service determinations."  (Defs.' SJ Mot. at 22.) They base their assertion on a single statement made by Representative Mason:  "We aren't going to give [a noncitizen service member] his citizenship papers the next day after he joins the army, in any instance."  77th Cong. 14.  But receipt of a certified N-426 *is not* the same as receipt of citizenship papers.  A certified N-426 is only part of an application for naturalization under § 1440.  Once a naturalization application is received, USCIS will schedule an appointment with the applicant to have her biometrics taken.  USCIS, A Guide to Naturalization 31 (2016).  After the applicant attends that appointment, the applicant must submit any additional paperwork required by USCIS.  *Id.*  USCIS then conducts its own investigation of the applicant and schedules an interview.  Once the applicant is interviewed, USCIS is required to make a determination on the application within 120 days.  *See* 8 U.S.C. § 1447(b).  If the application is approved, the applicant will receive a ceremony date, at which time she will take the Oath of Allegiance and then receive her Certificate of Naturalization.  *Id.*  Thus, even when an enlistee

57

receives a certified N-426 after one day of service, she must wait a significant amount of time before becoming a citizen.[41]  Representative Mason's statement is therefore consistent with Congress's intent to allow noncitizen service members to *apply* for naturalization under § 1440 without regard to the amount of time they have served.[42]

The 1942 version of the statute was carried forward by the INA, *see* 66 Stat. 249–50, and in 1968, § 1440 was amended to expand eligibility for naturalization to those who served in the Vietnam War and in future designated periods of hostility.  *See* 82 Stat. 1343–44.  As noted *supra*, *see* Section II.B.3 (Analysis), the legislative history of this amendment provides that "an alien or noncitizen national who has served honorably . . . may be naturalized *without regard to . . . a waiting period*. . . .  [T]he peacetime serviceman must have a minimum of 3 years' service[;] the wartime serviceman has *no minimum required*."  (Pls.' SJ Mot. Ex. 3, at 4–5 (emphasis added)); *see also* 114 Cong. Rec. 30,763 (tying eligibility under § 1440 to service during a designated period of hostility, rather than location of service).  USCIS, the agency responsible for administering § 1440, has consistently interpreted the statute in accordance with this legislative history.  According to the agency, § 1440 extends the benefit of expedited

---

[41] Indeed, the average USCIS processing time for all military naturalization applications in May of 2017, while the USCIS Naturalization at Basic Training Initiative was still in place, was approximately four months.  *See Nio*, 385 F. Supp. 3d at 56.  According to the USCIS website, naturalization application processing times are currently much longer, with times ranging from twelve to seventeen and a half months in Houston, Texas, and between nine and twenty-eight months in Honolulu, Hawaii.  Check Case Processing Times, USCIS, https://egov.uscis.gov/processing-times/ (last visited August 10, 2020).

[42] As noted, at least one court has interpreted the Nationality Act as amended in 1942 to "establish[] no prerequisites as to duration of service" for eligibility to naturalize.  *Petition of Delgado*, 57 F. Supp. at 461.  The court held that a noncitizen "serving honorably for one day or one week[] [wa]s eligible for citizenship under [the NA] upon compliance with the applicable naturalization requirements."  *Id.*

naturalization to "aliens who served in the U.S. Armed Forces during specific periods of hostilities . . . *without having served for any particular length of time*."  75 Fed. Reg. 2,785.

Defendants argue that the only remaining service requirement of Section I of the N-426 Policy, the active-duty requirement of the Reservist Minimum Service Requirement, is required by the text of § 1440.  (Defs.' SJ Mot. at 33 ("[T]he only criteria imposed by Congress [in § 1440] is that the service must have been (1) honorable and (2) in an active-duty status."); 7/16/20 Tr. at 32 ("MR. SWINTON: . . . [T]he second sentence of subsection A [of § 1440] makes clear that they must have serv[ed] in an active duty status.").  Defendants hang their hat on the second sentence of subsection (a), which states, "The executive department under which such person served shall determine whether persons have served honorably *in an active-duty status*."  8 U.S.C. § 1440(a) (emphasis added).  But this reading, too, contradicts the text and legislative history of § 1440.  *Catawba Cnty. v. E.P.A.*, 571 F.3d 20, 35 (D.C. Cir. 2009) ("[A] statute may foreclose an . . . interpretation despite . . . textual ambiguities if its structure, legislative history, or purpose makes clear what its text leaves opaque.").

At its inception, § 1440 of the INA applied to noncitizens who "ha[d] served honorably in an active-duty status."  66 Stat. 250.  In 2003, Congress amended the statute so that it would apply to anyone "serv[ing] honorably as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status."  117 Stat. 1693 (emphasis added).  Because the word "or" "'is almost always disjunctive, . . . the phrases it connects are to be given separate meanings.'"  *Pinson v. U.S. Dep't of Justice*, 964 F.3d 65, 69 (D.C. Cir. 2020) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)) (alteration omitted).  Thus, § 1440, as amended in 2003, applies to any noncitizen "serv[ing] honorably as a member of the Selected Reserve of the Ready Reserve," without regard to whether he or she is serving "in an active-duty status."

59

The legislative history confirms that the statute applies equally to Reservists and active-duty service members, without imposing any further requirements on the former category of enlistees. As detailed *supra*, *see* Section II.B.3 (Analysis), the Congressional Record relating to the 2003 amendment shows that Congress intended to extend to Reservists *the same* "process of immediate naturalization" that had existed for those serving in an Active Component. *See* 149 Cong. Rec. S7,280–83.

> Again, USCIS has interpreted § 1440 consistent with this legislative history:
>
> [T]he [2003 amendment] extended the benefit of naturalization not only to individuals who served honorably in an active duty status during specified periods of hostilities, but also to individuals who have served honorably as members of the Selected Reserve of the Ready Reserve of the U.S. Armed Forces during such periods of hostilities.

75 Fed. Reg. 2,785.

In sum, to determine whether a noncitizen enlistee has "served honorably," § 1440 allows DOD to consider only an enlistee's *past* service. DOD may not, through a time-in-service requirement or an active-duty requirement, convert this determination to a certification of present military suitability or active honorable service.

Moreover, DOD's duty under § 1440 is a mandatory one. The statute provides that DOD "*shall* determine whether persons have served honorably." 8 U.S.C. § 1440(a) (emphasis added). The word "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) (citation and internal quotation marks omitted).

DOD contends that the 1948 amendment to the Nationality Act "undercuts any notion that [DOD's] role is ministerial." (Defs.' SJ Mot. at 23.) The pre-1948 version of the statute provided that honorable service be proved by filing two affidavits of at least two citizen

60

servicemembers "of the noncommissioned or warrant officer grade or higher . . . or by a duly authenticated copy of the record of the executive department having custody of the record of petitioner's service." 56 Stat. 182. The 1948 amendment added the requirement that "[t]he executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions." 62 Stat. 282. But that the statute was amended to require more action of DOD does not preclude its being "nondiscretionary." *W. Org. of Res. Councils*, 892 F.3d at 1241 (citation and internal quotation marks omitted) ("The legal duty must be ministerial or nondiscretionary and must amount to a specific, unequivocal command." (citation and internal quotation marks omitted).) In fact, DOD and USCIS counsel acknowledged in *Nio* that certifying Form N-426 is ministerial. *See Kirwa I*, 285 F. Supp. at 38 ("DOD serves a ministerial role in determining if an individual is serving honorably." (quoting Defs.' Resp. to Pls.' Mot. for a Prelim. Inj. at 36, *Nio*, ECF No. 19)).

Thus, not only is DOD prohibited from considering anything beyond an enlistee's past service record in determining whether he or she has served honorably, but upon receipt of a request to certify an N-426 by a noncitizen who has satisfied the one day of qualifying service, DOD *must* make the required determination. Accordingly, the Court will grant summary judgment to plaintiffs on their claims that the Minimum Service Requirements are contrary to law and that DOD's refusal to certify plaintiffs' N-426s because they have not met those requirements constitutes agency action unlawfully withheld.[43]

---

[43] Plaintiffs agreed that, unless their other claims failed, it was not necessary for the Court to address their notice-and-comment claim. (7/16/20 Tr. at 80–81.) Because the Court will grant summary judgment to plaintiffs on their three other claims, the Court will not reach the merits of their notice-and-comment claim.

61

# CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment will be granted, and

defendants' motion for summary judgment will be denied.  The Minimum Service Requirements

will be vacated.  A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

Date:   August 25, 2020

62

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ANGE SAMMA, *et al.*,

                Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
DEFENSE, *et al.*,

                Defendants.

Civil Action No. 20-cv-1104 (ESH)

---

## ORDER AND JUDGMENT

At issue in this case under the Administrative Procedure Act ("APA") is the lawfulness of a Department of Defense ("DOD") policy, set forth in a memorandum issued on October 13, 2017, on the subject of "Certification of Honorable Service for Members of the Selected Reserve of the Ready Reserve and Members of Active Components of the Military or Naval Forces for the Purposes of Naturalization" ("N-426 Policy"), specifically the requirements in Sections I.3.a and I.3.b that provide:

    (1)    A service member in an Active Component can only obtain a certified USCIS Form N-426 if that service member has:

- Successfully completed the basic training requirements of the armed forces of which he/she is a member; AND

- Completed at least 180 consecutive days of active duty service, inclusive of the successful completion of basic training . . . .

and

    (2)    A service member in the Selected Reserve of the Ready Reserve can only obtain a certified USCIS Form N-426 if that service member has:

- Successfully completed the basic training requirements of the armed forces of which he/she is a member; AND

- Completed at least one year of satisfactory service toward non-regular retirement in accordance with [DODI] 1215.07, "Service Credit for Non-Regular Retirement," as a member of the Selected Reserve, inclusive of the member's successful completion of basic training . . . .

(*See* Administrative Record 6-9 ("Minimum Service Requirements").)

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment, ECF No. 4, is **GRANTED**; it is further

**ORDERED** that defendants' cross-motion for summary judgment, ECF No. 19, is

**DENIED**; it is further

**ORDERED** that the Minimum Service Requirements in the N-426 Policy are

**VACATED**; it is further

**ORDERED** that defendants are enjoined from withholding certified Form N-426s from

any class member[1] based on a failure to complete the Minimum Service Requirements; and it is

further

**ORDERED** that defendants shall endeavor to certify or deny a submitted Form N-426

---

[1] The Court has certified a class that consists of all individuals who:

(a) are noncitizens serving in the U.S. military;

(b) are subject to Section I of the October 13, 2017 N-426 Policy (AR 6) ("N-426 Policy"), as updated by DOD's April 24, 2020 Memorandum (AR 1);

(c) have not received a certified N-426; and

(d) are not Selected Reserve MAVNIs in the class certified in *Kirwa v. U.S. Dep't of Defense*, No. 17-cv-1793 (D.D.C. Dec. 1, 2017).

*Samma v. U.S. Dep't of Def.*, No. 20-cv-1104, 2020 WL 4501000, at *10 (D.D.C. Aug. 4, 2020).

expeditiously, but in no case shall it take longer than the 30 days allowed under DOD's April 24,

2020 update to the N-426 Policy.

  This is a final, appealable Order.



      ELLEN S. HUVELLE
      United States District Judge

Date: August 25, 2020